## ALASKA v. ARCTIC MAID ET AL.

No. 106. Argued March 23, 1961.—Decided May 1, 1961.

*Gary Thurlow,* Deputy Attorney General of Alaska, argued the cause for petitioner. With him on the briefs were *Ralph E. Moody,* Attorney General, and *Richard A. Bradley,* Assistant Attorney General.

*Martin P. Detels, Jr.* argued the cause and filed a brief for respondents.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

While Alaska was a Territory, the Territorial Legislature amended L. 1951, c. 116, its taxing statutes, to read, in relevant part, as follows:

"Section 1. BUSINESSES IN ALASKA FISHERIES REQUIRING LICENSES: AMOUNTS

THEREOF. Any person, firm or corporation prosecuting or attempting to prosecute any of the following lines of business in connection with Alaska's commercial fisheries shall first apply for and obtain, on the conditions hereinafter set forth, a license so to do on the basis of the following license taxes which are hereby levied:

"(b) Freezer ships and other floating cold storages: An annual license tax equal to 4% of the value of the raw halibut, halibut livers and viscera, salmon and bottom fish, shellfish or other fishing resource bought or otherwise obtained for processing through freezing. The value of the raw material under this license shall be the actual price paid for same including indirect considerations such as fuel or supplies furnished by the processor or offsets to the cash value for gear furnished etc. Such value shall apply to the raw material herein mentioned which is procured in company owned or subsidized boats operated by employees of the processor or under lease or other arrangement."

Respondents[1] use freezer ships for the taking and preservation of salmon along Alaska's shores. These freezer ships use "catcher boats" which respondents own or have under contract and which catch salmon off Alaska. The freezer ships sometimes purchase salmon from independent fishermen.

Bristol Bay is a famous fishing ground for salmon. When operating in the Bristol Bay area, the freezer ships

---

[1] One of the respondents is a Washington corporation. Four remaining respondents are partnerships all of whose members are citizens of the United States and residents of either California or Washington. The Pacific Reefer Co. is the owner of the ship *Reefer II*, as to which a tax lien is asserted to exist by virtue of the activities of a previous owner. It too is a foreign corporation.

anchor more than three miles from the coast, because of the shallow waters in Bristol Bay. They serve as a base for their catcher boats that fish within the territorial waters. In other areas both the freezer ships and the catcher boats stay within the territorial waters.

When the catcher boats—which are shallow-draft and known as gillnetters—have a load or desire to discontinue fishing or when the open season ends, they return to the "mother" ship and unload. The salmon are usually dumped into quick-freezing brine tanks. At other times they are placed in freezing compartments and frozen by blasts of air. The freezer ships eventually return to Puget Sound in the State of Washington where the salmon are canned.

Alaska, when a Territory, brought these suits in the District Court of Alaska for taxes claimed to be due and owing under the foregoing Act. The District Court entered judgments for the plaintiff. 140 F. Supp. 190. It held that the taking of the fish was the taxable event, not the freezing of the fish.

On appeal the Court of Appeals held that respondents were taxable for fish caught by their catcher boats within territorial waters, even though the freezer ships remained outside the three-mile limit. In its view the catcher boats "operated by the freezer ship itself are but an extension of that ship's operations." It held, however, that respondents were not responsible for taxes on fish taken "by independent catcher boats but purchased by the freezer ships" outside territorial waters. There was a rehearing *en banc* and on the rehearing the Court of Appeals held that the tax incident was not taking fish but "the freezing and cold storage of fish aboard freezer ships." It held that the tax could not be levied even if the freezer ships received the salmon in territorial waters. It reasoned that the freezing and storage of the fish was an inseparable part of interstate commerce and could not be taxed

locally any more than the loading and unloading of interstate carriers. Cf. *Joseph* v. *Carter & Weekes Co.,* 330 U. S. 422; *Richfield Oil Corp.* v. *State Board,* 329 U. S. 69. Accordingly it reversed the District Court. 277 F. 2d 120. The case is here on a petition for certiorari which we granted because of the importance of the ruling to the new State of Alaska. 364 U. S. 811.

We put to one side the specialized cases such as *Richfield Oil Corp.* v. *State Board, supra,* which arise under the Export-Import Clause of the Constitution (Art. I, § 10, cl. 2), because none of the salmon involved in these cases was destined to a foreign country. We also consider irrelevant cases such as *Joseph* v. *Carter & Weekes Co., supra,* where a state tax was laid on the gross receipts of a stevedore who was loading and unloading vessels engaged in interstate commerce. A tax on an integral part of an interstate movement might be imposed by other States "with the net effect of prejudicing or unduly burdening commerce" as the Court said in *Michigan-Wisconsin Pipe Line Co.* v. *Calvert,* 347 U. S. 157, 166.

We have no such problem here. This tax is one imposed on those "prosecuting or attempting to prosecute . . . lines of business in connection with Alaska's commercial fisheries." The business in question is the one specified in subsection (b): "Freezer ships and other floating cold storages." To be sure, the tax is computed on the "value" of the fish "bought or otherwise obtained for processing through freezing." That, however, is the measure of the tax, not the taxable event. The taxable event is "prosecuting" the "business" of "Freezer ships and other floating cold storages." Part of the business is, of course, transporting frozen fish interstate. Yet it is plain that a freezer ship is more—much more—than an interstate carrier. Part of its business is freezing fish. Yet these ships do more than freeze fish and transport them interstate. Taking the fish directly through their

own catcher boats or obtaining them from other fishermen is also a part of respondents' business. Without the taking or obtaining of the fish, the freezer ship would have no function to perform.

It is clear that Alaska has power to regulate and control activity within her territorial waters, at least in the absence of conflicting federal legislation. *Skiriotes* v. *Florida,* 313 U. S. 69, 75. That case involved a state law forbidding the use of certain equipment in taking sponges in waters two marine leagues from mean low tide off Florida's coast. We upheld Florida's power to regulate sponge fishing in that manner and in that area, as Congress had not adopted any inconsistent regulation. See also *Toomer* v. *Witsell,* 334 U. S. 385, 393. Alaska's jurisdiction to tax respondents' operations within her territorial waters—whether those activities are taking fish or purchasing fish taken by others—is equally clear. See *Wisconsin* v. *Penney Co.,* 311 U. S. 435, 444; *Ott* v. *Mississippi Barge Line,* 336 U. S. 169, 174.

If the fish were taken or purchased outside Alaska's territorial waters, all of respondents' business in the Bristol Bay area would be beyond Alaska's reach. But since some of the fish in all of the cases before us were taken in Alaska's waters or otherwise acquired there, respondents are engaged in business in Alaska when they operate their "freezer ships." For we know from this record that in this particular business taking and freezing are practically inseparable. Fish are highly perishable and cannot be kept fresh very long even in Alaska's latitude. The process of gathering fish either through the catcher boats that are part of respondents' fleet or through independent operators is a "local activity" (*Michigan-Wisconsin Pipe Line Co.* v. *Calvert, supra,* 166) in a vivid sense of the term. We see no reason why our cases involving the taking of shrimp (*Toomer* v. *Witsell, supra*) and the extraction of ore (*Oliver Iron Mining Co.* v. *Lord,* 262

U. S. 172) are not dispositive of this controversy. The *Oliver Iron* case is indeed a first cousin of the present case. Here, as there, the tax is an occupation tax. Here, as there, the market for the product obtained locally is interstate, the taking being a step in a process leading to an interstate market. In both the local product is promptly loaded for interstate shipment. But in each there is a preliminary local business being conducted— an occupation made up of a series of local activities which the State can constitutionally reach. Catching the fish or obtaining them in other ways from the local market is but an extension of the freezer ship's operations within Alaska's waters.

It is claimed that there was no tax on salmon caught and frozen in Alaska and destined for canning in Alaska and that therefore this law is discriminatory against freezer ships. Alaskan canneries, however, paid a six-percent tax on the value of salmon obtained for canning; [2] and local fish processors, which sell to the fresh-frozen consumer market, paid a one-percent tax.[3] The freezer ships do not compete with those who freeze fish for the retail market. The freezer ships take their catches south for canning. Their competitors are the Alaskan canners; and we know from the record that fish canned locally usually are not frozen.[4] When we look at the tax laid on local canners and those laid on "freezer ships," there is no discrimination in favor of the former and against the latter. For no matter how the tax on "freezer ships" is computed, it did not exceed the six-percent tax on the local canners. Hence cases such as *Pennsylvania* v. *West Virginia*, 262 U. S. 553, 595–596, which hold invalid state laws that

---

[2] L. 1949, c. 82, § 1 (a), as amended, L. 1951, c. 113, § 1.

[3] L. 1949, c. 97, § 1 (a), as amended, L. 1951, c. 116, § 1.

[4] Fish are sometimes frozen for local canneries when the run is more than the canneries can take care of; but that freezing is merely an adjunct of the local canning industry.

prefer local sales over interstate sales, are inapposite. If there is a difference between the taxes imposed on these freezer ships and the taxes imposed on their competitors, they are not so "palpably disproportionate" (*Harvester Co.* v. *Evatt,* 329 U. S. 416, 422) as to run afoul of the Commerce Clause. No "iron rule of equality" between taxes laid by a State on different types of business is necessary. *Caskey Baking Co.* v. *Virginia,* 313 U. S. 117, 119–121; *Morf* v. *Bingaman,* 298 U. S. 407, 414; *Capitol Greyhound Lines* v. *Brice,* 339 U. S. 542, 546–547.

The judgment is reversed. Since we do not know how many fish, if any, were obtained outside Alaska's territorial waters,[5] we remand the cause to the Court of Appeals for proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE HARLAN, dissenting.

It is with reluctance that I have reached the conclusion that this Alaska tax offends the Commerce Clause of the Federal Constitution. (Art. I, § 8, cl. 3.)

The Court of Appeals concluded that the taxable event under this statute is the process of freezing fish aboard ship. 277 F. 2d 120. This conclusion was based on the words of the statute (quoted at pp. 199–200 of the Court's opinion), the fact that obtaining fish for local sale or consumption is untaxed, and the fact that the present tax "applies whether or not the fish are caught by gillnetters owned by or under contract to appellants." *Id.,* 125–126. Accepting, as I do, this construction of the statute, I agree with the Court of Appeals that a *privilege* tax directed solely at shipboard freezing, preparatory to interstate shipment, exceeds the limitations the Commerce

---

[5] Alaska contends that its territorial waters in the Bristol Bay area reach beyond the usual three-mile limit. That is a claim on the merits of which we express no opinion.

Clause imposes upon the States, for in its requirement of a license such a tax asserts a power to deny what is a necessary local incident of the right to make interstate purchases. See *York Manufacturing Co.* v. *Colley,* 247 U. S. 21.*

As I understand the Court's opinion, it seeks to meet this objection by denying that the Alaskan tax is imposed on the privilege of freezing fish aboard ships. It says that the tax is rather upon the local taking or purchase of fish *by or for freezer boats.* But even on this view of the incidence of the tax, I could not agree that the present tax on obtaining fish by or for interstate freezer boats would be constitutional in the given circumstances, for I do not think that Alaska can place a higher tax on the obtaining and freezing of fish for interstate markets than it places on the obtaining and freezing of fish for local markets. See *Pennsylvania* v. *West Virginia,* 262 U. S. 553, 596, 597. As shown in the Court's opinion, under the Alaska scheme of taxation freezer boats, which operate solely in interstate commerce, must pay a tax for taking and freezing Alaskan fish for later canning in Washington which is four times that imposed on a local freezer whose product is sold to consumers in Alaska. A shore-based freezer who sells his frozen product to Alaskan canners pays no tax at all.

For these reasons I would affirm the judgment of the Court of Appeals.

---

*I also regard the tax as invalid because it in effect charges a toll for the interstate transportation of Alaska's natural resources. See Brown, The Open Economy: Justice Frankfurter and the Position of the Judiciary, 67 Yale L. J. 219, 232–233.