Robert S. CALVERT et al., Appellants,

v.

PANHANDLE EASTERN PIPE LINE
COMPANY et al., Appellees.

Robert S. CALVERT et al., Appellants,

v.

TENNESSEE GAS TRANSMISSION
COMPANY, Appellee.

Nos. 11118, 11119.

Court of Civil Appeals of Texas.

Austin.

Oct. 23, 1963.

Rehearing Denied Oct. 30, 1963.

Waggoner Carr, Atty. Gen., Joseph Trimble and Paul Phy, Asst. Attys. Gen., Austin, for appellants.

John G. Brendel, Stone Wells, Houston, Wade Spilman, William E. Wells, Austin, for appellee Tenn. Gas Transmission Co.

R. Dean Moorhead, Austin, Wendell J. Doggett, William S. Richardson, Kansas City, Mo., Head & Lyle, Corpus Christi, Arthur R. Seder, Jr., Chicago, Ill., Paul S. Davis, Detroit, Mich., F. Vinson Roach, Ralph P. Blodgett, Omaha, Neb., Fulbright, Crooker, Freeman, Bates & Jaworski, Austin C. Wilson, Richard L. McGraw, Houston, Clark, Thomas, Harris, Denius & Winters, Austin, Ross, Hardies & O'Keefe, Charles C. McDugald, William W. Brackett, Chicago, Ill., for appellees Panhandle Eastern Pipe Line Co. and others.

PHILLIPS, Justice.

These cases were filed and briefed separately, however they were submitted and argued together, present the same questions, consequently we will determine the issues in one opinion.

This is an appeal by the Comptroller of Public Accounts, the Attorney General and the Treasurer of the State of Texas from a judgment of the District Court declaring the Dedicated Reserve Tax Act, Article 3.11 of Title 122A, Vernon's Ann.Rev.Civ.St. to be unconstitutional and void for the reasons that the tax levied by the Act is prohibited by the Commerce Clause of the Constitution of the United

States [1] and is discriminatory in violation of the provisions of Article I, Sections 3, 16 and 19, Article VIII, Sections 1 and 2, of the Constitution of the State of Texas, Vernon's Ann.St., and of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States. The judgments ordered a refund to appellees (plaintiffs below) of all taxes paid and to be paid by them under protest.[2]

We sustain the judgment of the Trial Court in the proposition that the tax levied is prohibited by the Commerce Clause of the Constitution of the United States, consequently we will not discuss the second part of the Trial Court's holding that the tax is discriminatory.

Under Section (1), subsection II of the Act before us [3] there is an attempt to classify the appellees herein as producers:

1. The Federal Constitution provides that Congress shall have the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Section 8 of Article 1, Cl. 3.

2. In cause No. 11,119 the five appellees are Panhandle Eastern Pipeline Company, Transcontinental Gas Pipeline Corporation, Michigan Wisconsin Pipe Line Company, Natural Gas Pipeline Company of America, and Northern Natural Gas Company. In cause No. 11,118, the appellee is Tennessee Gas Transmission Co.

3. Art. 3.11, Title 122A, Vernon's Ann. Revised Civil Statutes of the State of Texas is hereafter set out, in part, for reference:
"(1) Declaration of Policy.
"It is the policy of this State to obtain, as near as may be consistent with a fair and equitable tax policy, a tax return to the State of not less than one cent (1¢) per MFC on each MCF of natural gas produced and saved from the earth and waters of this State. The same is deemed necessary:

"I. to derive a reasonable State revenue from the trillions of cubic feet of gas removed from the earth and waters of the State each year, and

"II. to tax equitably all of those persons integrally engaged in the occupation of removing such gas, so that one associated group of them will not derive a windfall by virtue of a very small tax burden on each thousand cubic feet of gas produced by such others.

"It is further the policy of this State, in order to promote conservation and to distribute equitably the burden of natural resources taxation, to recognize and clarify fully by statute the relation between various persons engaged in the occupation of producing natural gas so that the taxpayer in each instance may be identified clearly, and so that all persons so engaged in the occupation of production will bear equitaby the taxes imposed in connection with the severance of gas from Texas soil.

"Pursuant to this policy it is recognized that contractual relations exist in such natural gas production occupation between several definable groups, all engaged integrally in such occupation of severance of natural gas from the soil and all having such a direct and beneficial interest in the production of gas that for the purpose of taxation they may be classified as producers of gas. It is the policy of the State of Texas to recognize that all such persons, integrally engaged in the occupation of severance of natural gas from the soil-producers, severance producers and dedicated reserve producers, have a taxable interest in production of gas in Texas.

"(2) Definitions.

"The definitions contained in Article 3.04, insofar as applicable, shall govern the meanings of the terms used in this Article. In addition, the following definitions are specifically applicable to this Article:

"(a) 'Severance producer' means any person owning, controlling, managing or leasing any gas well and/or any person who produces in any manner any gas by taking it from the earth or waters of this State, and shall include any person owning any royalty or other interest in gas or its value, whether produced by him, or by some other person in his behalf, either by lease or contract or otherwise, when such person producing gas is in contractual relation with the dedicated reserve producer (either directly, or, if a royalty or other holder of an interest in gas in place and thereby entitled to a fractional share of the value of such gas in place, indirectly through the producer).

"(b) 'Dedicated reserve producer' means any person holding a written

"* * * to recognize and clarify fully by statute the relation between various persons engaged in the occupation of producing natural gas so that the taxpayer in

contract for a designated term specified therein which confers upon such person the right to take title to gas from particular lands, leases and reservoirs in this State and imposes upon a severance producer the duty to supply all or a designated quantity or portion of gas produced by that severance producer (or by that severance producer in conjunction with other severance producers) to the dedicated reserve producer at a fixed or determinable price.

"(c) 'Severance beneficiary' has the following meaning:

"I. In the case where there is in effect a dedicated reserve contract as to the gas in question, the term 'severance beneficiary' refers to the dedicated reserve producer.

"II. In the case where there is no dedicated reserve contract in effect as to the gas in question, the term 'severance beneficiary' refers to the producer.

"(d) 'Dedicated reserve contract' means any written contract for a designated term specified therein which confers upon a dedicated reserve producer the right to take title to gas from particular lands, leases and reservoirs in this State, and imposes upon a severance producer the duty to supply all or a designated quantity or portion of gas produced by that severance producer (or by that severance producer in conjunction with others) to the dedicated reserve producer at a fixed or determinable price.

"(e) I. Meaning of Residue Gas.

"A. As to gas from which liquefiable hydrocarbons are removed, 'residue gas' means that constituent part of the whole quantity of gas removed from the earth and waters of this State which eventually constitutes the residue. The tax is applicable under the terms of this Article to such constituent part of the whole quantity of gas at the time when it, along with the associated gasoline or other liquefiable hydrocarbons, is actually severed from the earth and waters of this State.

"B. As to gas from which liquefiable hydrocarbons are not removed, 'residue gas' means the entire quantity except that gas which is:

"(i) injected into the earth, unless sold for such purpose;

"(ii) produced from oil wells with oil and lawfully vented or flared; or

"(iii) used for lifting oil, unless sold for such purpose.

"II. How measured. Such residue gas shall be measured by determining that portion of gas containing gasoline or other liquefiable hydrocarbons (that are to be removed or extracted at a plant by scrubbing, absorption, compression, or any other process) which is left after the application of such process and which flows through the outlet of such plant. In the event that such gas is processed in more than one such plant, the residue gas content shall be measured as that portion of the gas which flows through the outlet of the first plant.

"As to that gas which passes through a separator and which is not processed in a plant to remove or extract the gasoline or other liquefiable hydrocarbons, the residue gas content shall be measured as that portion of the gas remaining after its passage through such separator. In the event that such gas passes through more than one separator, the residue gas content shall be measured as that gas remaining after the passage through the first separator.

"As to that gas which passes through a drip or trap and which does not pass through a separator and which is not processed in a plant to remove or extract gasoline or other liquefiable hydrocarbons, the residue gas contents shall be measured as that portion of the gas remaining after passage through such drip or trap. In the event that such gas passes through more than one drip or trap, then the residue gas content shall be measured as that portion of the gas remaining after its passage through the last drip or trap.

"As to that gas which passes through a meter and which does not pass through a drip or trap and which does not pass through a separator and which is not processed in a plant to remove or extract the gasoline or other liquefiable hydrocarbons, the residue gas content shall be measured as that portion of the gas remaining after it passes through such meter. In the event that such gas passes through more than one meter, then the residue gas content shall be measured as that gas which passes through the first meter.

"(f) 'MCF' means thousand cubic feet.

"(3) The Tax Herein Levied.

each instance may be identified clearly, and so that all persons so engaged in the occupation of production will bear equitably the taxes imposed in connection with the severance of gas from Texas soil." And further: "Pursuant to this policy it is recognized that contractual relations[hips] exist in such natural gas production occupation between several definable groups, all engaged integrally in such occupation of severance of natural gas from the soil and all having such a direct and beneficial interest in the production of gas that for the purpose of taxation they may be classified as producers of gas. It is the policy of the State of Texas to recognize that all such persons, integrally engaged in the occupation of severance of natural gas from the soil-producers, severance producers and dedicated reserve producers, have a taxable interest in production of gas in Texas."

There is no dispute in that each of the appellees before this Court come under the provisions of the Act in question as a "dedicated reserve producer" or "severance beneficiary" as set out in (b) and (c) of Section (2).

There are stipulations to the effect that all of the gas purchased by appellees, except for relatively minor quantities sold in Texas or used as fuel for appellee's compressor stations, has a destination outside the State of Texas through every stage of the production, gathering, processing, sale to appellees, and transmission and sale in markets other than in Texas. All of such

gas moves in a continuous stream from the producing wells to markets in other states, without break, in a steady flow, ending, as contemplated from the beginning, at points outside the borders of Texas.

Appellees perform only two activities in Texas in connection with such gas; by purchase they *take* the gas under the varying circumstances summarized above; and they *transport* such gas out of Texas in interstate commerce.

For purpose of illustration we come again to the factual situation of appellee Michigan Wisconsin Pipe Line Company.

Michigan Wisconsin owns a pipeline that runs approximately one-half mile from the outlet of a gasoline plant owned and operated by Phillips Petroleum Company in Hansford County, Texas, to a point on the Texas-Oklahoma border where such line leaves Texas. Michigan Wisconsin purchases residue gas from Phillips at the outlet of such plant. Michigan Wisconsin transports such residue gas through such pipeline out of Texas in interstate commerce. There are stipulations to the effect that this company produces no gas in Texas or elsewhere. It gathers no gas in Texas. All the gas which it obtains in Texas is residue gas, which is the gas remaining from natural gas as produced at the wells after certain liquefiable hydrocarbons have been removed from it. Such residue gas is delivered to Michigan Wisconsin by Phillips Petroleum Company at the outlet of a gasoline plant owned by Phillips in Hans-

"(a) There is hereby levied, in addition to all other occupation taxes on the occupation of producing gas in Texas, an occupation tax on the business or occupation of producing gas within this State as a severance beneficiary at the rate of one cent (1¢) per thousand cubic feet of residue gas produced, applicable at the time the said gas is severed from the earth or waters of this State, less the amount of tax paid per MCF under the provisions of Article 3.01 of this Chapter, computed in the following manner:
"In the case of all gas subject to the tax imposed by Article 3.01 there shall

be ascertained the amount of tax in cents and fractions of a cent per thousand cubic feet paid to the State with respect to each quantity of such gas by virtue of the seven per cent (7%) of value tax provided in that Article. If such amount is less than one cent (1¢) per MCF, then there shall be determined the difference between such amount and one cent (1¢) per MCF. Such amount multiplied by the quantity of the residue gas in question shall constitute the tax obligation of the severance beneficiary of such residue gas."

ford County, Texas. Concurrently with such delivery, such gas flows immediately into the facilities of Michigan Wisconsin for transportation by it to markets outside Texas.

For the purposes of this opinion it will not be necessary to further deliniate the variations in obtaining gas used by the remaining appellees herein since Section (7) of the Act before us declares its provisions nonseverable and that if any portion thereof is declared invalid as to any severance beneficiary, it shall be invalid as to the producer and all other severance beneficiaries.

In Michigan-Wisconsin Pipe Line Company v. Calvert, 347 U.S. 157, 74 S.Ct. 396, 98 L.Ed. 583, the Supreme Court of the United States in declaring the Texas "Gas Gathering Tax" unconstitutional described the identical purchase of gas by Michigan Wisconsin that is set out above. In this case the Court stated that the problem was not whether the State could tax the actual gathering of all gas whether transmitted in interstate commerce or not but whether the State had delayed the incidence of the tax beyond the step where production and processing had ceased and transmission in interstate commerce had begun. The Court held that the incidence of the tax was the "taking" of gas from Phillips' gasoline plant; that this event had occurred after the gas had been produced, gathered and processed by others than Michigan Wisconsin; that the "taking" into Michigan Wisconsin's pipeline was solely for interstate transmission and the gas at that time was not only actually committed to but was moving in interstate commerce. The Court, in striking down this tax as a burden on interstate commerce further observed that it would permit a "multiple burden" upon that commerce in that if the fiction urged to uphold the tax was validated, other states through which the gas passed could indulge in a similar venture, the net effect of which

would be substantially to resurrect the customs barriers which the Commerce Clause was designed to eliminate.

In Calvert v. Transcontinental Gas Pipeline Corporation, Tex.Civ.App., 341 S.W.2d 679, writ refused, this Court speaking through Justice Hughes struck down a "Severance Beneficiary Tax." Again the identical fact situation of the Michigan-Wisconin Phillips gas purchase was described, as there Michigan Wisconsin was a "severance beneficiary" just as here. This Act attempted to impose the tax as one on production or severance of the gas in place in that those persons who exercise the privilege of obtaining the production of dedicated gas pursuant to dedication contracts with producers had a sufficient interest in the production of such gas to justify the imposition of the tax upon them. This. Court affirmed the judgment of the Trial Court that the tax created a burden on interstate commerce.

The State contends that the tax before us is nothing more than an additional production tax [4] laid on those having a direct and beneficial interest in the production of natural gas. Further that the operating incidence of the tax is different from that in the gas gathering tax and the severance beneficiary tax, both of which were held invalid in the cases cited above. That the incidence of the tax in the present case is. the production of gas which is purely a local activity.

With reference to residue gas (as purchased by Michigan-Wisconsin from Phillips in the example cited above) the State points out that Article 3.11, Sec. (2) (e), par. I, subd. A., under the heading "Meaning of Residue Gas" states that the tax is. applicable "at the time when it, along with the associated gasoline or other liquefiable hydrocarbons, is actually severed from the earth and waters of this State." Article

---

4. Art. 3.01, Vernon's Ann.Rev.Civ.St. is a production tax on natural gas that was first enacted in 1931 and is presently in effect. Section (3) (a) of the tax presently before this Court provides that the tax paid under Art. 3.01 is to be deducted from any tax due under it.

3.11, Section (3), under the tax levied refers to the rate of one cent (1¢) per thousand (1,000) cubic feet of "residue gas produced" which rate is applied "at the time the said gas is severed."

It will also be noted that Section (2) (e), subsection II, of the Act calls for residue gas to be measured at the outlet of a gasoline plant after liquefiable hydrocarbons have been removed. An example of such measurement and purchase is outlined in the Michigan-Wisconsin-Phillips factual situation described above. This measurement section of the Act further provides that residue gas that does not pass through a plant shall be measured after passing through a separator or a drip or a meter.

Irrespective of what the Act labels the tax and of what other declarations are found in the Act that seek to attach the tax to the production or production and processing of natural gas, in the Michigan-Wisconsin example cited above, it is apparent, as the U. S. Supreme Court found in the Michigan-Wisconsin Pipe Line Case cited above, that the tax attaches to the gas after it has been produced and processed and has been purchased and has begun its journey in interstate commerce. See Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441.

■ Where a tax is a burden on interstate commerce it is not made valid by isolating and denominating some incident or element as a "local activity" transpiring wholly within the state and designating such incident or element as the focal point of the tax. In this connection see Nippert v. Richmond, 327 U.S. 416, 66 S.Ct. 586, 90 L.Ed. 760.

In the recent case of Northern Natural Gas Company v. State Corporation Commission of Kansas, 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963) the Supreme Court of the United States struck down an order of the State of Kansas seeking to regulate Northern Natural as a producer of gas. The Court held that "production and gathering" are terms narrowly confined to the physical acts of drawing the gas from the earth and preparing it for the first stages of distribution. The Court further held that Northern Natural was not a producer but a purchaser of gas from producers.

We hold that appellee Michigan Wisconsin Pipeline Company in its operation within the State of Texas as shown above is not a producer of gas but a purchaser of gas.

The State relies on the case of State of Alaska v. Arctic Maid, 366 U.S. 199, 81 S. Ct. 929, 6 L.Ed.2d 227, where the Supreme Court of the U. S. upheld a tax imposed by Alaska on the value of fish caught and brought by small boats to a freezer ship anchored both outside and within the territorial waters of Alaska. The Court held that the freezer ships were liable for the tax, that the tax was not on interstate commerce, that the taxable event was prosecuting the business of freezer ships even though the tax was computed on the value of the fish brought.

The Arctic Maid case is not in point here. It is merely a recent extension of the many "production tax" cases which hold that the producing of goods by manufacturing, mining, drilling or similar methods is a local activity which may be taxed by the State, even though the goods are destined for interstate commerce. This line of cases holds that where goods are produced and prepared for interstate commerce, the State has a taxable interest. Here the privilege taxed is exercised before interstate commerce begins. See Oliver Iron Mining Co. v. Lord, 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929. These cases stand on footing different from those in which local regulations of the business of purchasing a commodity within and shipping it without the State have been deemed to impede or embarrass interstate commerce in those commodities. Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 42 S.Ct. 106, 66 L.Ed. 239.

We also overrule the State's contention that appellees may be classified as produc-

ers for the purpose of taxation under the doctrine announced by the Court in Barwise v. Sheppard, 299 U.S. 33, 57 S.Ct. 70, 81 L.Ed. 23. This case holds that the parties to a mineral lease are engaged in a common venture for their mutual benefit. We cannot equate this holding with the State's contention that a dedicated reserve contract creates just as substantial a common venture between the dedicated reserve producer and the producer as an oil and gas lease creates between a royalty owner and a lessee. A purchaser through dedicated reserve contracts and the gas producer deal with each other at arms length. Instead of sharing in the proceeds derived from the production and sale of gas, the pipeline purchaser provides such proceeds and the lessor-lessee sellers receive and share them.

The judgment of the Trial Court is affirmed.

Affirmed.

HUGHES, J., disqualified and not sitting.