STATE of Alaska, et al., Appellants,

v.

**REEFER KING COMPANY,
INC., Appellee.**

STATE of Alaska et al., Appellants,

v.

**NEW NELCO, INC., et al., Appellees.**

**NEW NELCO, INC., et al.,
Cross-Appellants,**

v.

STATE of Alaska et al., Cross-Appellees.

Nos. 2605, 2607.

Supreme Court of Alaska.

Dec. 13, 1976.

Rehearing Denied April 13, 1977.

John R. Messenger, Asst. Atty. Gen., Avrum M. Gross, Atty. Gen., Juneau, for appellants and cross-appellees.

L. B. Jacobson of Robertson, Monagle, Eastaugh & Bradley, Juneau, for appellees and cross-appellants.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

## OPINION

BURKE, Justice.

This case involves the construction and application of the Alaska statute governing the taxation of fish processors, AS 43.75.-060.[1] The appellees, Reefer King Co., Inc. (owner of the REEFER KING) and New

---

1. Sec. 43.75.060. *Fisheries business licenses.* A person engaging or attempting to engage in any of the following lines of business in connection with the state's commercial fisheries shall first obtain a license.

   (1) Shore-based cold storages and other fish processors, except salmon canneries, herring processing plants, crab canneries, and clam canneries otherwise licensed shall pay an annual license tax equal to one per cent of the value of the raw halibut, halibut livers and viscera, salmon and bottom fish, shellfish or other fishing resource bought or obtained for processing through freezing, salting, or other method. The value of the raw material under §§ 60–90 of this chapter is the actual price paid for it, including indirect considerations such as fuel or supplies furnished by the processor or offsets to the cash value for gear furnished. The value applies to the raw material procured in

Nelco, Inc. (owner of the NELCO I), are both Washington corporations operating factory ships in Alaska waters. Alaska crab caught by smaller, independently owned fishing boats was collected by the appellees and processed on board the two vessels. The REEFER KING and the NELCO I did not engage directly in crab harvesting.

From 1964 to 1969 both the REEFER KING and the NELCO I conducted processing operations in a large number of Alaskan communities including Kodiak, Kitoi Bay, Kempff Bay, Adak, Finger Bay, Sweeper Cove, Dutch Harbor, Unikatli Bay, Chisak Bay, Akutan, Chernofski, and Vasilief Bay. The vessels would collect and process harvested crab in one location until available crab diminished, at which time the ships would move on to another location. Both ships made annual voyages to Seattle, Washington, for repair and maintenance.

AS 43.75.060 provides for a tax of 1% of the value of the raw fish taken by "shore-based" processors; a tax of 4% of the value of the raw fish taken and processed is levied against "floating" processors. Subsection (3) of the statute defines a "shore-based" processor as one which:

company-owned or subsidized boats operated by employees of the processor or under lease or other arrangement.

(2) Freezer ships and other floating cold storages shall pay an annual license tax equal to four per cent of the value of the raw halibut, halibut livers and viscera, salmon and bottom fish, shellfish, or other fishing resource bought or obtained for processing through freezing, salting, or other method, or the taking of crab for export without such processing. The value of the raw material under §§ 60–90 of this chapter is the actual price paid for it including indirect considerations such as fuel or supplies furnished by the processor or offsets to the cash value for gear furnished. The value applies to the raw material procured in company-owned or subsidized boats operated by employees of the processor or under lease or other arrangement.

(3) In (1) of this section, "shore-based cold storages and other fish processors" mean those cold storages and processing plants which are permanently attached to the land or have remained in the same location for a period of not less than one calendar year. Any cold storage or processing plant removed from the state is a

. . . [is] permanently attached to the land or [has] remained in the same location for a period of not less than one calendar year.

Subsection (4) of the statute defines a "floating" processor as one which is not "shore-based," as defined in subsection (3).

At all times (except for the 1968–1969 period in the case of the REEFER KING) the appellee processors paid taxes as "floating" processors under AS 43.75.060. The state commenced suit against the owner of the REEFER KING for payment of the 4% "floating" tax due for 1968–1969. Reefer King Co. cross-claimed, contending that a refund for overpayment of taxes in prior years was owing because the ship had been improperly classified as "floating" and subjected to the higher tax rate. Simultaneously, the owner of the NELCO I, which had paid the 4% "floating" tax without interruption from 1964 to 1969, commenced suit against the state seeking a refund of alleged overpayments in prior years. New Nelco also contended that its processor should have been classified as "shore-based" and subjected to the 1% tax rate.[2]

The owners of both processors filed motions for summary judgment, the material

floating cold storage under (2) of this section from the day of removal.

(4) Cold storages and fish processing plants which are not shore-based under (3) of this section are "floating cold storages" under (2) of this section.

2. The following table reflects the relevant tax data for each processor:

REEFER KING

| Year | Amount Paid | Tax at 4% | Tax at 1% | Difference |
|------|------------|-----------|-----------|-----------|
| 1964 | 5,879.86 | 5,879.86 | 1,530.88 | 4,348.98 |
| 1965 | 21,689.99 | 21,689.99 | 5,422.49 | 16,266.75 |
| 1966 | 23,020.49 | 23,020.49 | 5,755.12 | 17,265.37 |
| 1967 | 12,605.22 | 12,605.22 | 3,151.39 | 9,453.83 |
| 1968-69 | 11,167.14 | 44,668.57 | 11,167.14 | 33,501.43 |
| TOTAL | 74,363.00 | 107,864.13 | 27,027.02 | 47,334.43*(a) 33,501.43*(b) |

NELCO I

| Year | Amount Paid | Tax at 4% | Tax at 1% | Difference |
|------|------------|-----------|-----------|-----------|
| 1964 | 5,420.98 | 5,420.98 | 1,336.50 | 4,084.48 |
| 1965 | 15,418.06 | 15,418.06 | 3,835.77 | 11,582.29 |
| 1966 | 20,117.93 | 20,117.93 | 5,010.73 | 15,107.20 |
| 1967 | 21,811.21 | 21,811.21 | 5,434.06 | 16,377.15 |
| 1968 | 25,091.95 | 25,091.95 | 6,254.23 | 18,837.72 |
| 1969 | 10,605.17 | 10,605.17 | 2,651.29 | 7,953.88 |
| TOTAL | 98,465.30 | 98,465.30 | 24,522.58 | 73,942.72 |

*(a) Reflects the total alleged overpayments by the processor.
*(b) Reflects the total alleged underpayment by the processor.

facts in the case being undisputed.[3] The motions were granted by the trial court which ruled that (1) the state's claim against Reefer King for 4% taxes due for 1968 and 1969 was dismissed with prejudice; (2) Reefer King's counterclaim for excess taxes paid between 1964 and 1967 was granted; (3) New Nelco's claim for excess taxes paid during 1964 and 1965 was dismissed as being barred by the statute of limitations because of the owner's lack of capacity to maintain suit; and (4) New Nelco's claim for excess taxes paid during the years 1966 to 1969 was granted.

The state has appealed the trial court's decision to grant the processors' motions for summary judgment. The state contends that the trial court erred in ruling that the processors should have been subjected to the lower tax rate. New Nelco has cross-appealed, contending that the trial court erred in barring its claims for alleged over-payments during 1964 and 1965.

This appeal requires that we examine the trial court's construction and application of AS 43.75.060 and scrutinize the constitutionality of the taxation scheme applicable to fish processors.

## I. CONSTRUCTION AND APPLICATION OF AS 43.75.060

The history of Alaska's statute, regulating the taxation of fish processors, was reviewed in our prior decision in *State v. Wakefield*, 495 P.2d 166 (Alaska 1972). We adhere to the analysis articulated in *Wakefield*. The original version of AS 43.75.060 was enacted by the territorial legislature in 1949.[4] The statute taxed fish processors by requiring that they obtain licenses assessed at a percentage of the value of the raw fish taken. Specifically, "cold storage and other

fish processors" were required to pay a 1% tax on the value of the raw resource.

Subsection (2) of the statute was added by amendments enacted by the territorial legislature in 1951.[5] That provision required that "freezer ships and other floating cold storages" be taxed at 4% of the value of the raw resource taken. Additionally, the legislature added the words "shore-based" to modify the reference to "cold storages" taxed at 1%. This amendment was intended to impose a higher tax on roving vessels whose activities were confined to freezing seafood for further processing before ultimate marketing.

In 1955, subsection (2) was amended[6] to include in the 4% category those freezer ships and other floating cold storages which used a process of "salting, or other method, or the taking of crab for export without such processing." Justice Connor, writing for the majority in *Wakefield*, said of this amendment that it " . . . bears out the policy of taxing those transient fisheries which could exploit the resource and avoid regulation or taxation."[7]

The 1966 amendments[8] to the statute are at issue in this appeal. Changes made in that year inserted the present subsections (3) and (4). Subsection (3) provides a two-pronged test for determining whether a particular processor is "shore-based" as required in subsection (2) to qualify for the lower 1% tax rate. Subsection (4) provides that those processors which do not qualify as "shore-based" under subsection (3) are "floating." We are called upon to determine whether the REEFER KING and the NELCO I were "shore-based," thus qualifying for the 1% tax rate, or "floating" and subject to the 4% tax applicable to such processors.

---

**3.** Summary judgment is appropriate where there is no genuine issue as to any material fact and a party is entitled to judgment as a matter of law. Rule 56(c), Alaska Rules of Civil Procedure.

**4.** Ch. 97, SLA § 1 (1949).

**5.** Ch. 116, SLA § 1 (1951).

**6.** Ch. 102, SLA § 1 (1955).

**7.** 495 P.2d 166, 171.

**8.** Ch. 88, SLA § 1 (1966).

AS 43.75.060 (3) provides two methods by which a processor may qualify for "shore-based" status:

(1) A processor must be "permanently attached to the land", or

(2) must have "remained in the same location for a period of not less than one calendar year."

The test contained in subsection (3) is clear and unequivocal. We reject the processors' arguments that a broad reading of this provision is demanded here. Thus, we must next inquire whether the REEFER KING or the NELCO I met either of the requirements set out in subsection (3).

■ Neither the NELCO I nor the REEFER KING were "attached to the land" as contemplated in subsection (3). The processors have argued that they were attached to the land in two respects: first, that there was an "economic attachment," since they were dependent on the local economies of the communities in which they processed for supplies; second, that they were physically attached to the land since they required access to a supply of fresh water in order to carry out their processing. We reject both of these arguments. The

NELCO I and the REEFER KING were no more attached to the land than is any "floating" processor. As conceded by the processors here, all processors require access to a supply of fresh water. Similarly, all processors must maintain some economic attachments with local communities since supplies and services are frequently required. The type of attachment contemplated by the statute is some palpable physical attachment or a permanent berthing. A vessel situated in such a manner as to permit pedestrian access from land onto the processing vessel would meet this test. This construction is consistent with the history of the taxation statute which, in prior versions, required just such an attachment to qualify for "shore-based" status.[9]

■ Since the REEFER KING and the NELCO I were not "attached to the land," their owners must demonstrate that they "remained in one location for not less than one calendar year" in order to qualify for the lower tax rate applicable to "shore-based" processors. Upon examination of the record in this case, however, we find that the processors did not remain in one location as required by the statute.[10] Both

9. Ch. 116, SLA § 1 (1951).

10. The record reflects the following itineraries of the two vessels:

REEFER KING

| Date | Location |
|---|---|
| April 26, 1965 | Dry Dock in Seattle, Washington |
| August 28, 1965 | Seattle to Kodiak, Alaska |
| September 3, 1965 | Arrive at Kodiak, Alaska |
| September 4, 1965 | Kitoi Bay, Alaska |
| September 8, 1965 | Kodiak, Alaska |
| April 21, 1966 | Kodiak to Seattle, Washington |
| April 28, 1966 | Arrive at Lake Union, Washington |
| August 11, 1966 | Seattle to Kodiak, Alaska |
| August 17, 1966 | Arrive at Kodiak, Alaska |
| April 21, 1967 | Kodiak to Seattle, Washington |
| April 28, 1967 | Arrive at Seattle, Washington |
| July 1, 1967 | Seattle to Kodiak, Alaska |
| July 5, 1967 | Arrive at Kodiak, Alaska |
| July 9, 1967 | Kempff Bay, Alaska |
| August 17, 1967 | Ugak, Alaska |
| September 17, 1967 | Kempff Bay, Alaska |
| October 29, 1967 | Kodiak, Alaska |
| November 3, 1967 | Adak, Alaska |
| November 9, 1967 | Finger Bay, Alaska |
| December 5, 1967 | Sweeper Cove Alaska back to Finger Bay, Alaska |
| December 7, 1967 | Sweeper Cove, Alaska |
| December 8, 1967 | Finger Bay, Alaska |
| January 4, 1968 | Sweeper Cove, Alaska back to Finger Bay, Alaska |
| January 25, 1968 | Sweeper Cove, Alaska back to Finger Bay, Alaska |
| February 14, 1968 | Sweeper Cove, Alaska back to Finger Bay, Alaska |
| March 2, 1968 | Adak Island to Seattle, Washington |
| March 14, 1968 | Arrive Bellingham, Washington |
| March 16, 1968 | At West Waterway-Seattle, Washington |
| April 6, 1968 | Tie at Lake Union, Washington |
| April 8, 1968 | Move to dry dock |
| June 19, 1968 | Lake Union dry dock to Seattle Port - West Seattle, Washington |
| June 24, 1968 | Bellingham, Washington |
| June 26, 1968 | Bellingham to Kodiak, Alaska |
| June 30, 1968 | Kodiak, Alaska |
| July 2, 1968 | Leave Kodiak for Dutch Harbor, Alaska |
| July 4 or 5, 1968 | Dutch Harbor, Alaska |
| July 10, 1968 | Unikatli Bay, Alaska |
| July 24, 1968 | Dutch Harbor, Alaska |
| July 27, 1968 | Kodiak, Alaska |
| August 1, 1968 | Kempff Bay, Alaska |

REEFER KING—Cont'd

| Date | Location |
|---|---|
| August 30, 1968 | Kodiak, Alaska |
| September 4, 1968 | Dutch Harbor, Alaska |
| September 14, 1968 | Depart Dutch Harbor for Adak, Alaska |
| September 14, 1968 | Adak Island, Alaska |
| October 23, 1968 | Sweeper Cove, Alaska |
| October 24, 1968 | Finger Bay, Alaska |
| December 17, 1968 | Sweeper Cove, Alaska |
| December 21, 1968 | Finger Bay, Alaska |
| January 14, 1969 | Sweeper Cove, Alaska |
| January 15, 1969 | Finger Bay, Alaska |
| March 10, 1969 | Finger Bay to Seattle via Sweeper Cove, Alaska |
| March 12, 1969 | Adak to Seattle, Washington |
| March 23, 1969 | Dock at Ballard, Washington |

NELCO I

| Date | Location |
|---|---|
| September 2, 1965 | Seattle, Washington |
| September 18, 1965 | Chisak Bay, Alaska |
| September 23, 1965 | Vasilief Bay, Alaska |
| October 5, 1965 | Chisak Bay, Alaska |
| October 12, 1965 | Finger Bay, Alaska |
| April 13, 1966 | Finger Bay, Alaska |
| August 14, 1966 | Tokeland, Washington |
| August 27, 1966 | Akutan, Alaska |
| October 9, 1966 | Chernofski, Alaska |
| October 17, 1966 | Finger Bay, Alaska |
| April 4, 1967 | Finger Bay, Alaska |
| July 7, 1967 | Tokeland, Washington |
| July 19, 1967 | Dutch Harbor, Alaska |
| July 28, 1967 | Akutan, Alaska |
| October 27, 1967 | Akutan, Alaska |
| November 6, 1967 | Finger Bay, Alaska |
| March 26, 1968 | Finger Bay, Alaska |
| June 20, 1968 | Tokeland, Washington |
| June 27, 1968 | Dutch Harbor, Alaska |
| July 5, 1968 | Akutan, Alaska |
| July 24, 1968 | Vasilief Bay, Alaska |
| August 14, 1968 | Finger Bay, Alaska |
| January 14, 1969 | Vasilief Bay, Alaska |
| February 18, 1969 | Finger Bay, Alaska |
| June 17, 1969 | Akutan, Alaska |
| July 11, 1969 | Akutan, Alaska |

the REEFER KING and the NELCO I conducted processing operations in several Alaskan communities and sailed, on a somewhat regular basis, from one to the next in order to avail themselves of the most plentiful supplies of crab. Indeed, this is the single characteristic which separates most "floating," roving processing operations from their "shore-based" competitors.

The processors have cited *Wakefield, supra,* for the proposition that some vessel movement is permitted without destroying a processor's "shore-based" status. Their reliance on *Wakefield,* however, is misplaced. In *Wakefield,* we stated that the movement of a processing vessel from its Alaska location to Seattle for dry docking and maintenance did not destroy that processor's "shore-based" status. It is clear from the record, however, that both the REEFER KING and the NELCO I engaged in vessel movement of a much greater degree than did the ships in *Wakefield.* In addition to the yearly trips to Seattle for maintenance, the processors here also sailed among several Alaskan communities to conduct their processing operations. It is this movement which disqualifies these processors from "shore-based" status under the statute.

We do not mean to undermine the reasoning articulated in *Wakefield.* To the extent that the continued operations of a processing vessel demand out-of-state ship maintenance, vessel movement will not be deemed to eliminate a processor's "shore-based" status. But a processor which engages in the type of activity as did the REEFER KING and the NELCO I cannot expect to be able to claim "shore-based" status.

Although we have concluded that the processors were "floating" under AS 43.75.060(4), our prior decision in *Wakefield* requires that the processors be subjected to a 1% tax rate during the years 1964 and 1965. In *Wakefield,* we concluded that it was the 1966 amendment to the statute which first created a distinction between "shore-based" and "floating" processors based solely on the movements and locations of the vessels. Prior to 1966, the primary distinguishing feature of the "floating" processor was its method of processing its catch, rather than its movement in the waters. At that time, the higher 4% tax was directed only at floating freezer or "cold storage" ships which took crab for export without processing it in Alaska. All other processors, both ashore and afloat, were taxed at the lower rate of 1%. Since both the REEFER KING and the NELCO I were factory ships which processed their catch in various Alaskan communities, we conclude that prior to the time the 1966 amendments became effective,[11] the REEFER KING and the NELCO I did not qualify as "floating" processors and should have been taxed at the rate of 1%.

Thus, in the case of the REEFER KING, the processors are due $30,289.05 for excess taxes paid from 1964 to July 1, 1966, plus interest;[12] the state, however, is owed $33,501.43 for taxes due for a period from July 1, 1968 to 1969 (during which the processors erroneously paid at the 1% rate), plus interest.

Computation of NELCO I's taxes requires our resolution of one additional matter. Under the analysis set out above, the processors, having paid 4% taxes for the entire period of their operations in Alaska, would not owe any additional sums to the state. Moreover, in accordance with our view of the effect of the 1966 amendments, the owner of the NELCO I would be entitled to a refund from the state in the amount of $23,277.57 for excess taxes paid in 1964 and 1965.[13] At trial, however, the superior court dismissed New Nelco's claim for excess taxes paid in 1964 and 1965 as

---

11. The 1966 amendments became effective on July 1, 1966.

12. This figure includes excess taxes paid up to July 1, 1966, the date the 1966 amendments took effect.

13. This figure also includes excess taxes paid up to July 1, 1966, the date the 1966 amendments took effect.

being barred by the statute of limitations. In its cross appeal, New Nelco now contends that the court erred with respect to its claim for taxes paid in 1965, conceding that any claims arising out of overpayment of taxes in 1964 were barred by the statute of limitations.

If the 1965 claim is not barred, the processors are entitled to recover $19,193.09, plus interest. If, however, the 1965 claim is barred, the processors are only entitled to a refund of overpayments made in 1966 (prior to July 1, the date the 1966 amendments became effective). In that case, a refund of $7,610.80, plus interest, would be due.

The owner of NELCO I paid taxes, at the rate of 4% of the value of the raw resource taken, for all of the years from 1965 through 1969. On March 24, 1971, New Nelco filed suit seeking a refund for excess taxes paid between 1964 and 1969. In its complaint, New Nelco asserted that it was a foreign corporation qualified to do business in the State of Alaska and had paid its annual corporate license taxes and filed its annual reports as required by law.[14] At the time the corporation commenced suit on March 24, 1971, it had, in fact, failed to comply with the statutes requiring payment of corporate taxes and filing of the annual report. Both the report and the taxes had been due three months earlier, on January 2, 1971.[15] Following the filing of the complaint, and before the state filed an answer, the parties informally agreed to take no further action in the case pending the outcome of the *Wakefield* case (argued to this court in June, 1971; decided March 31, 1972). Thereafter on August 18, 1971, the parties entered into a formal "Stipulation to Hold Proceedings in Abeyance Pending Determination of Similar Cause." The stipulation provided in relevant part:

WHEREAS the above-captioned case is, in many issues, analogous to the case of *State of Alaska vs. Wakefield Fisheries, Inc.,* and *Pan-Alaska Fisheries Inc.,* presently on appeal to the Alaska Supreme Court, files no. 1397 and 1398 argued June 3, 1971, and,

WHEREAS it is believed by respective counsel that the Alaska Supreme Court's decision to be rendered in the consolidated *Wakefield* and *Pan-Alaska Fisheries* case will be substantially dispositive of all issues of law raised in the above-captioned case, and,

WHEREAS the parties agree that a temporary suspension of discovery and other procedures toward the furtherance of prosecution and defense of the above-captioned case will result in a mutual savings of time and expense to all parties to the proceedings as well as obviate the necessity for demands upon the time of the court;

IT IS THEREFORE AGREED:

1. That the Plaintiffs will refrain from prosecuting and the defendants refrain from defending the above-captioned case until one month after the Alaska Supreme Court renders its decision in the consolidated *Wakefield* and *Pan-Alaska* case as aforementioned.

2. That if defendants have not filed an answer at the expiration of the one-month period following the Alaska Supreme Court's decision in *Wakefield* and *Pan-Alaska,* that plaintiffs shall give defendants 10 days notice of intent to file default.

3. That the temporary abeyance of proceedings and furtherance of prosecution and defense of this case is made without prejudice to either party and shall not constitute a waiver by plaintiffs of any of

---

**14.** *See* AS 10.05.720 which provides:

> No domestic or foreign corporation may commence or maintain a suit, action or proceeding in a court in the state without alleging and proving that it has paid its annual corporation tax last due and has filed its annual report for the last calendar or fiscal year for which the report became due. A certificate of the payment of the annual tax

and filing of the annual report is prima facie evidence of the payment of the tax and the filing of the annual report. The commissioner shall issue the certificate or a duplicate for a fee of 25 cents.

**15.** Satisfaction of the corporate statutory requirements is a condition precedent to a corporation's right and standing to maintain suit.

the causes of action stated in the complaint nor a waiver by defendants of any defense which may be raised in answer thereto.

On March 31, 1972 this court delivered its decision in the case of *State v. Wakefield Fisheries, Inc.* On May 27, 1972, nine months after the signing of the stipulation and fourteen months after the filing of the initial complaint, the state filed its answer to the taxpayer's complaint. The state denied that New Nelco, the owner of the NELCO I, had paid its annual corporate license taxes for 1971 and denied that New Nelco had filed its annual report for 1970. The state asserted, by way of affirmative defense, that all claims arising out of tax payments allegedly made prior to March 23, 1967 were barred by the applicable statute of limitations. A month later, on June 20, 1972, the taxpayer moved to file an amended complaint after complying with the law in paying its corporate taxes and filing its annual report. The state opposed the motion, asserting that since the taxpayers did not have the capacity to bring or maintain suit from March 24, 1970 to that date, they should be left in the same position as if they had first commenced their action when they filed as a competent entity. The superior court adopted the state's position. In a memorandum and order dated July 27, 1972, the court ordered that the taxpayers could file an amended complaint after compliance with the license and report provisions of AS 10.05.720 and that the statute of limitations applicable to claims for tax refunds would be deemed tolled as of the date of filing of the taxpayer's amended complaint. The superior court's order had the effect of barring claims arising out of the 1964 and 1965 tax payments since those payments were made on March 29, 1965 and March 22, 1966, respectively, more than six years prior to the filing of the taxpayer's amended complaint (August 7, 1972).[16]

The purpose of the stipulation was to maintain the status quo. At the time it was entered into, on August 18, 1971, and for more than seven months thereafter, New Nelco's claim for excess taxes paid in 1965 was not barred by the statute of limitations. The statute of limitations became a viable defense to the claim only upon March 23, 1972, after the passage of six years from the date of payment. The only thing preventing New Nelco from asserting a valid claim prior to March 23, 1972, was its lack of capacity to maintain suit under AS 10.05.720. However, such lack of capacity does not necessarily bar a recovery.

Rule 9(a), Alaska Rules of Civil Procedure, provides in part:

> When a party desires to raise an issue as to . . . the capacity of any party to sue . . ., *he shall do so by specific negative averment* . . . (emphasis added)

In *King v. Petroleum Services Corporation,* 536 P.2d 116, 118 (Alaska 1975), where the defendant's answer failed to deny the plaintiff's allegations that it had paid its corporate tax and filed its annual report, we held that "failure to raise the issue of capacity to sue [in accordance with the requirements of Civil Rule 9(a)] results in a waiver of the defense." (footnote omitted)

In the instant case, had the state been required to file its answer within the time allowed by the applicable rules of civil procedure,[17] rather than within the extended time permitted by the terms of the stipulation, the state's assertion of New Nelco's lack of capacity would have had to occur well in advance of March 23, 1972. In that event, New Nelco would have had an opportunity to pay its corporate taxes and file its annual report and to qualify to commence and maintain its claim prior to the date upon which the defense of the statute of limitations became available to the state.

---

16. AS 09.10.050 provides a six year statute of limitations on all contract claims.

17. Rule 12(a), Rules of Civil Procedure, provides in part:

The state or an officer or agency thereof shall serve an answer to the complaint or to a cross-claim, or a reply to a counterclaim, within 40 days after the service upon the attorney general or the pleading in which the claim is asserted.

Under these circumstances, we consider it patently unfair for the state to assert, months after the stipulation was entered into, that New Nelco's claim is barred by the statute of limitations. Accordingly, we hold that such action by the state is prohibited by the doctrine of equitable estoppel,[18] and that the superior court erred in barring the taxpayer's claim for overpayment of taxes in 1965.

New Nelco was due $11,582.29 for overpayments in 1965 and an additional $7,610.80 for overpayments made during the first half of 1966 (up to the effective date of the 1966 amendments which had the effect of changing the taxpayer's rate from 1% to 4%), plus interest.

## II. CONSTITUTIONAL CHALLENGE

Both processors, as appellees in this action, have challenged the constitutionality of the tax statute applicable to fish processors. They have launched an attack based on the Commerce Clause [19] of the United States Constitution and the equal protection clauses of both the state and federal constitutions.[20]

■ The processors contend that AS 43.-75.060, which imposes a higher tax upon "floating" processors than upon "shore-based" processors, is unconstitutional as applied to them because it violates the Commerce Clause of the United States Constitution. Article I, section 8 of the United States Constitution gives to Congress the power to "regulate commerce . . . among the several States," and the processors argue that the state may not intrude upon this power. We are satisfied that the tax complained of does not interfere with interstate commerce in a constitutionally prohibited fashion, because interstate movement of the type present here is excluded from determination of "floating" status under *State v. Wakefield Fisheries, Inc.*, 495 P.2d 166 (Alaska 1972). In *Wakefield*, we held that movement to Washington for purposes of routine dry docking and maintenance did not affect the tax status of processing ships otherwise meeting the requirements for "shore-based" classification. The processing ships in this appeal make similar trips to Washington. It is clear that their classification as "floating" processors is based not upon their interstate movement, but upon their movement within Alaskan waters. For the purposes of application of this statute, there is no interstate movement, and, therefore, there is no burden nor even an incidental impact upon interstate commerce.[21]

■ The processors also contend that the state has in two ways deprived them of their rights to equal protection of the law. First they argue that the state has selectively enforced the statute against them by proceeding to collect the tax from them, while waiving enforcement against five other processors which were similarly situated. Under *Nelson v. State*, 387 P.2d 933

**18.** In *Groseth v. Ness*, 421 P.2d 624, 630 (Alaska 1966) we stated:

We are of the opinion that the doctrine of equitable estoppel as a prohibition against unjust reliance upon a statute of limitations is a salutary one and therefore adopt the rule for this jurisdiction. (footnote omitted)

**19.** United States Constitution, Article I, section 8 provides in part:

*Powers of Congress.* Congress shall have [the] power . . . To regulate commerce with foreign nations, and among the several states, and with the Indian tribes.

**20.** The fourteenth amendment to the United States Constitution provides in part:

*Citizenship rights not to be abridged by states.* No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Alaska Constitution, Article I, section 1, provides:

*Inherent Rights.* This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protections under the law; and that all persons have corresponding obligations to the people and to the State.

**21.** *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976).

(Alaska 1964), an individual who claims that selective enforcement has deprived him or her of equal protection under the state constitution must show "a deliberate and intentional plan to discriminate," based upon some unjustifiable or arbitrary classification. There is a similar requirement for proof of a violation of equal protection rights under the federal constitution. *See Mackay Telegraph and Cable v. Little Rock*, 250 U.S. 94, 39 S.Ct. 428, 63 L.Ed. 863 (1919). The processors here have not made such a showing, and thus their claim fails.

Second, the processors claim that the statute creates an illegal classification since they, as "floating" processors, are taxed more heavily than similarly situated "shore-based" processors. In the past, classifications created by state statutes regulating economic affairs, and in particular those concerning taxation, have received the least judicial scrutiny when challenged on equal protection grounds. The United States Supreme Court has been tolerant in this regard:

> Where taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.[22]

In our recent decision in *Isakson v. Rickey*, 550 P.2d 359 (Alaska 1976), we adopted a new standard of equal protection analysis, for use where the compelling state interest test, requiring strict judicial scrutiny, is inappropriate. This new test requires that the classification in question

> . . . be reasonable, not arbitrary, and must rest upon some ground of dif-

ference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.[23]

Since this appeal involves neither a fundamental right [24] nor a suspect classification and thus does not qualify for strict scrutiny, the classification which differentiates "shore-based" from "floating" processors for the purposes of taxation must meet the test set out above.

The processors argue that the purpose of the classification is to tax more heavily the "floating" processors who "could otherwise evade local regulation and taxation, yet exploit a valuable state resource." [25] They contend that their operations do not evade regulation and taxation, and contribute as much to the state and local economies as do the "shore-based" processors. The processors' conception of the intent of the statute is derived from language in *State v. Wakefield* [26] which discusses the intent of an earlier version of the statute. That earlier version distinguished between types of processors as well as mobility of processors, taxing more heavily the "freezer ships" which operated without dependence on land. As the statute was amended to remove this distinction, and to widen the class of processors to be subject to the higher tax, the *Wakefield* characterization of the legislative intent is no longer meaningful. However, the statute reflects a similar sort of legislative judgment, that "shore-based" processors make a more valuable contribution to the state and local economies than do the "floating" processors. While the processors may argue that they contribute as much as the "shore-based" processors do, it cannot be disputed that the impacts of

---

**22.** *Lehnhausen v. Lake Shore Auto Parts*, 410 U.S. 356, 359, 93 S.Ct. 1001, 1003, 35 L.Ed.2d 351, 354–55 (1973).

**23.** *F. S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989, 990–91 (1920), quoted in *State v. Wylie*, 516 P.2d 142 (Alaska 1973) and *Isakson v. Rickey*, 550 P.2d 359, 362 (Alaska 1976). *See K & L Distributors, Inc. v. Murkowski*, 486 P.2d 351, 359 (Alaska 1971).

**24.** The processors have not argued that the tax infringes upon their right to travel within the state.

**25.** *State v. Wakefield Fisheries, Inc.*, 495 P.2d 166–71 (Alaska 1972).

**26.** *Id.*

the two types of operations on the local communities are substantially different in character. It was not arbitrary for the legislature to conclude that "shore-based" processors, with at least a year's commitment to one location, were to be preferred over floating processors, which distributed economic benefits over several locations.

In *Wakefield, supra,* we characterized the higher tax imposed upon freezer ships as a way to recoup, through taxation, the benefits lost to the state because of the freezer ships' mode of operation. The distinction between mobile and stationary processors could just as easily be characterized as a tax incentive, to encourage "shore-based" processors. In this light, the tax differential bears a fair and substantial relationship to the goal of encouraging societal contributions of the type made by "shore-based" processors, especially since conversion from "floating" to "shore-based" is a simple matter of remaining in one location for a calendar year. The state may legitimately encourage, through tax incentives or exemptions, industries or types of industries which it considers desirable, and this method of encouragement does not deprive other taxpayers, who do not qualify for the benefit, of their equal protection rights.[27]

■ Therefore, we conclude that the classification which imposes different tax rates on "floating" and "shore-based" processors does not constitute a violation of the federal and state guarantees of equal protection.[28]

The judgment of the superior court is affirmed in part and reversed in part, consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART.

27. *K & L Distributors, Inc. v. Murkowski,* 486 P.2d 351 (Alaska 1972). *See also Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976).

28. The processors also argue that the tax differential is so "palpably disproportionate" as to violate equal protection rights, citing *Alaska v. Arctic Maid,* 366 U.S. 199, 81 S.Ct. 929, 6

RABINOWITZ, Justice, dissenting in part.

The majority concludes that this court's prior decision in *State v. Wakefield Fisheries, Inc.,* 495 P.2d 166 (Alaska 1972), requires that the processors REEFER KING and the NELCO I be subjected to a 1% tax rate during the years 1964 and 1965. For the reasons advanced in my dissent in *Wakefield,*[1] I would hold that the processors in the instant appeal were subject to the 4% tax rate for 1964 and 1965.

In all other respects I agree with this court's disposition of the issues in this appeal.

L.Ed.2d 277 (1961). However, the language to which they refer concerns violation of the Commerce Clause, not equal protection guarantees. As explained above, this case does not have any effect on interstate commerce which would render the Commerce Clause even applicable.

1. *State v. Wakefield Fisheries, Inc.,* 495 P.2d 166, 173–75 (Alaska 1972).