STATE of Alaska, Appellant,

v.

WAKEFIELD FISHERIES, INC., a corporation, Appellee.

STATE of Alaska, Appellant,

v.

PAN ALASKA FISHERIES, INC., a corporation, Appellee.

Nos. 1397, 1398.

Supreme Court of Alaska.

March 31, 1972.

Ray M. Harding, Asst. Atty. Gen., John E. Havelock, Atty. Gen., Juneau, for appellant.

F. O. Eastaugh, of Robertson, Monagle, Eastaugh & Bradley, Juneau, for appellees.

John W. Riley, of Houghton, Cluck, Coughlin & Riley, Seattle, Wash., for Wakefield Fisheries.

Raymond W. Haman, of Lane, Powell, Moss & Miller, Seattle, Wash., for Pan Alaska Fisheries.

Before BONEY, C. J., and RABINOWITZ, CONNOR, and ERWIN, JJ.

CONNOR, Justice.

This is an appeal by the state from a superior court decision interpreting the tax rate to be applied to commercial crab fisheries. The trial judge found that the commercial fishing operations of the appellees are covered by AS 43.75.060(1), which would tax them at a rate of one percent of the value of the crab meat processed, rather than by AS 43.75.060(2), which would tax them at four percent of the value of the crab meat. The parties are in substantial agreement with the findings of fact. The appeal raises only legal problems about the applicable statutes and the nature of the operations conducted by appellees.

Wakefield Fisheries, Inc., owned three vessels active during the periods of taxation in question. The M. V. REEFER KING operated from 1959 through 1963. The M. V. DEEP SEA and the M. V. AKUTAN have been utilized in crab processing continually since 1960 and 1964, respectively.

Pan Alaska Fisheries, Inc., also owned and operated three vessels during the periods in question. The M. V. REEFER II engaged in crab fishing from 1962 through 1963. The M. V. MERCATOR has operated from 1959 to the present, and the M. V. ALASKA TRADER has been employed

in crabbing operations continually since 1962.

During the times in question the Wakefield vessels operated solely as floating processing plants for frozen, cooked crab. That process consists of obtaining live crab from independent catcher boats, cooking the crab, and freezing it aboard ship.

The shipboard operations of Pan Alaska during the same period were more diverse. During the 1962-65 seasons, the M. V. ALASKA TRADER and the M. V. REEFER II produced both cooked, frozen crab, and crab for canning. The latter is referred to in the industry as "green crab." The process for green crab is essentially the same as the process for cooked, frozen crab, but green crab is only partially cooked aboard the ship. It is then frozen and shipped to the State of Washington for thawing and further cooking before being hermetically sealed in containers. During the 1960-61 season, the M. V. MERCATOR was also outfitted as a floating cannery, and engaged in the total process of canning crab, in addition to producing cooked, frozen crab.

## I

The appeal presently before us focuses on the interpretation of an Alaska statute which can only be understood in the context of its historical development. In 1949 the territorial legislature taxed certain enumerated lines of commercial fisheries by requiring them to obtain business licenses assessed at a percentage of the value of the raw fish to be processed. "Cold storages and other fish processors", with the exceptions of certain processors taxed under other statutes (including crab canneries), were required to pay an annual tax equal to one percent of the value of the raw resource.[1]

In 1951 a second subsection was added. It required that "freezer ships and other floating cold storages" should be taxed at a rate of four percent of the value of the raw fish.[2] At the same time that this subsection was added, the first subsection was amended by adding the words "shore-based" to modify the reference to "cold storages;" and by adding the adjective "all" to the "other fish processors" to be taxed at the rate of one percent.

---

1. The original Act, ch. 97 SLA § 1 [1949], was substantially the same as the following quotation from the present AS 43.75.-060(1):

    *"Fisheries business licenses.* A person engaging or attempting to engage in any of the following lines of business in connection with the state's commercial fisheries shall first obtain a license.

    "(1) . . . [C]old storages and other fish processors, except salmon canneries, herring processing plants, crab canneries, and clam canneries otherwise licensed shall pay an annual license tax equal to one per cent of the value of the raw halibut, halibut livers and viscera, salmon and bottom fish, shellfish or other fishing resource bought or obtained for processing through freezing, salting, or other method. The value of the raw material under §§ 60-90 of this chapter is the actual price paid for it, including indirect considerations such as fuel or supplies furnished by the processor or offsets to the cash value for gear furnished. The value applies to the raw material procured in company-owned or subsidized boats operated by employees of the processor or under lease or other arrangement."

2. This amendment, ch. 116 SLA § 1 [1951], was substantially the same as the following quotation from the present AS 43.-75.060(2):

    "(2) Freezer ships and other floating cold storages shall pay an annual license tax equal to four per cent of the value of the raw halibut, halibut livers and viscera, salmon and bottom fish, shellfish, or other fishing resource bought or obtained for processing through freezing, . . . . The value of the raw material under §§ 60-90 of this chapter is the actual price paid for it including indirect considerations such as fuel or supplies furnished by the processor or offsets to the cash value for gear furnished. The value applies to the raw material procured in company-owned or subsidized boats operated by employees of the processor or under lease or other arrangement."

Again in 1955 the statute was amended to include in the four percent category of subsection (2) those freezer ships and other floating cold storages which use a process of "salting, or other method, or the taking of crab for export without such processing." [3]

Finally, in 1966, subsequent to the period which raises the major questions of taxation in this appeal, the legislature added the following subsections to the statute:

"(3) In (1) of this section, 'shore-based cold storages and other fish processors' mean those cold storages and processing plants which are permanently attached to the land or have remained in the same location for a period of not less than one calendar year. Any cold storage or processing plant removed from the state is a floating cold storage under (2) of this section from the day of removal.

"(4) Cold storages and fish processing plants which are not shore-based under (3) of this section are 'floating cold storages' under (2) of this section." [4]

The confusion which the statute created prior to the 1966 amendment is apparent in some of the relevant interpretations of the Attorney General and the particular rulings of the Department of Revenue. In June of 1962 the Attorney General opined that Pan Alaska should pay a one percent licensing tax on its shipboard cooked, frozen crab processing, and a four percent tax on its shipboard green crab processing. The Department of Revenue assessed Pan Alaska accordingly.

In contrast, the Department of Revenue ruled in February 1963 that Wakefield would only be assessed a one percent licensing tax on its green crab processing aboard ship. The following month Wakefield filed a claim for refunds from prior assessments of four percent during the calendar years 1959–62.

In May 1963, prior to any action by the Department of Revenue regarding the refund claim by Wakefield, the Attorney General reversed his earlier Pan Alaska opinion by noting that the correct distinction in the statute was between processes afloat and those ashore, and that the Pan Alaska opinion from his office incorrectly distinguished the tax according to whether the floating process was for ultimate cooked, frozen marketing or for ultimate canned marketing.

In January 1964 the Department of Revenue reversed its February 1963 ruling applicable to Wakefield. It later insisted that Wakefield pay the higher tax retroactively for operations during the seasons 1963–66. In February 1964 the Department of Revenue similarly assessed Pan Alaska's cooked, frozen crab operation at a tax rate of four percent.

Thus the question before us is whether, prior to the 1966 amendments, subsections (1) and (2) distinguished between "floating" and "shore-based" processing as the state now contends, or whether these subsections distinguished floating-freezing (or "cold storage") operations from all other processes both ashore and afloat, as the appellees contend. More pointedly, we are asked to decide whether "shore-based" in subsection (1) modifies both "cold storages" and "all other fish processors," or whether it only modifies "cold storages" such that "all other fish processors" include those afloat as well as ashore.

The original 1949 act taxed "cold storages" and "other fish processors" except those already being taxed under other specific statutory provisions. While crab canneries were taxed in a separate statute,[5] it must be presumed that all other crab pro-

---

3. Ch. 102, SLA § 1 [1955].

4. Ch. 88, SLA § 1 [1966]. In 1967 the statute was further amended by the addition of a subsection (5) which defined the tax as applying to the specific entity which "actually and physically processes" the resource. This subsection is not at issue in the present case.

5. AS 43.75.010(a) (3).

cesses were taxable under the general provision of the 1949 act.

■ In 1951 subsection (2) imposed a higher tax on "freezer ships" and on "other floating cold storages." At the same time the modifier "shore-based" was added to subsection (1), and the general clause of that provision was made more emphatically inclusive by the addition of the word "all." The fact that the new subsection referred to the specific type of vessel known in the industry as a freezer ship, and the fact that the general clause of subsection (1) was amended at the same time to make it even more expressly general, convinces us that the 1951 legislature intended to impose the higher tax only on that peculiar type of vessel which could be categorized in process and operation as a "freezer ship."

Thus we are compelled to determine what vessels constitute "freezer ships." We are aided in this determination by the United States Court of Appeals in the case of The Arctic Maid v. Territory of Alaska, 277 F.2d 120 (9th Cir. 1960), rev'd on other grounds, 366 U.S. 199, 81 S.Ct. 929, 6 L.Ed.2d 227 (1961), which discusses the nature of "freezer ship" operations in the early 1950's. At that time they were transient salmon freezing vessels which not only provided facilities for freezing and storage but also provided food, quarters and catcher boats for fishermen.[6]

The trial judge in the present case distinguished the vessels of the appellees as "factory ships" which process the produce caught by independent catcher boats. The findings of the trial court also note a number of other distinctions which we recognize. Freezer ships are commonly based outside Alaska and operate seaward—often beyond the three-mile limit. The appellees' factory ships on the other hand are based and operate within Alaska at relatively fixed positions along quays or near shore. They are dependent upon local labor and facilities, and thus are generally easily accessible for the administration of state laws.

Freezer ships merely preserve their catch for processing elsewhere. They employ a different freezing technique that the factory ships of the appellees, and their frozen product is sold in a different market than shore-based salmon freezers which generally freeze fresh, troll-caught salmon.

Finally, the factory ships withhold state income taxes from their employees, and pay other Alaska taxes, whereas the transient freezer ships have never withheld Alaska state income taxes or contributed to state revenues in any other way than to pay the specific tax levied on "freezer ships."

Our inclination to find this limited meaning of the term "freezer ships" is further supported by the fact that in 1951 when the legislation was amended, the crab industry in Alaska was a relatively untapped resource, and the appellees did not have any processing ships in operation. At that time the crab fishing industry was not one of the more noteworthy sources of revenue to the Territory of Alaska.

■ We agree with the conclusion reached by the trial court that the 1951 amendment was intended to impose the higher tax only on roving vessels, whose activities were confined to freezing seafood for further processing before ultimate marketing. During this period the statute was not, in our opinion, intended to apply to crab processors who conducted operations in Alaska which were different in kind from those of freezer ships.[7]

---

6.  277 F.2d at 122.

7.  The 1951 amendment imposed a higher tax on "freezer ships and *other floating cold storages*" (emphasis added). The general clause may indicate that the legislature intended to impose the higher tax on all vessels similar in operation to the "freezer ship" (which in the terminology of the trade was limited to transient, foreign-based salmon vessels which carried their own catcher boats and fishermen, generally operated seaward, and transported their catch to ports outside Alaska for

By 1955 the crab industry had become a more noticeably exploitable resource in Alaska. Subsection (2) was amended to include floating processes other than freezing, and to include "the taking of crab for export without such processing." This clause refers explicitly and singularly to crab which is to be exported without any processing in Alaska. The addition again bears out the policy of taxing those transient fisheries which could exploit the resource and avoid regulation or taxation. Hence we conclude that the appellees' factory ships were not included in this amendment.

▪ In summary we find that prior to the 1966 amendment, the legislature intended to distinguish between types of processes as well as locale of the operation. The higher tax was directed at those particular floating processors who could otherwise evade local regulation and taxation, yet exploit a valuable state resource.

Accordingly, under our reading of the statute in effect prior to 1966, the appellees are taxable at the lesser rate of one percent.

At trial the appellee Wakefield prayed for a declaratory judgment on the tax applicable to two of its vessels for the period after the 1966 amendments. The 1964 earthquake and seismic wave in Alaska had caused considerable damage to the company's shore facilities at Port Wakefield and Seldovia. To substitute for the inoperable shore-processing facilities, the M.V. AKUTAN was permanently moored at Port Wakefield, and the M.V. DEEP SEA was permanently moored at Akutan, Alaska. Between 1966 and the filing of this action neither vessel had moved from its mooring except for periods of drydocking in the State of Washington for routine maintenance. While moored, the vessels had used local water supplies, post offices, communication facilities and labor.

▪ We agree with the trial court that for licensing purposes the vessels are indistinguishable from other vessels permanently moored to the shore and presently licensed under the one percent rate of AS 43.75.-060(1). The vessels had remained at fixed locations for the statutory period of one calendar year. AS 43.75.060(3). Their removal from the state for drydock repairs does not require reclassification under the higher rate of taxation.[8]

## II

A number of procedural issues have also been raised in this appeal. Because we hold that the taxable rate prior to 1966 was one percent, we need not decide whether the first letter of notice to Pan Alaska from an official of the Department of Revenue, imposing the lower rate, was sufficient to constitute an administrative ruling which could not be changed retroactively or applied inconsistently.

We do, however, reach the question of whether the appellee Wakefield has satisfied conditions precedent to qualify for refunds of excessive taxes paid.[9] Appellant

---

processing). Such a reading would indicate that the legislature intended to levy a tax on those processors not amenable to other sources of revenue for the Territory, such as property tax on their processing plants, or employee withholding tax. However, even this reading does not include the appellees' vessels. As already noted, they did not carry their own catcher boats, nor did they operate seaward. They were generally moored near quays or slightly offshore. They purchased their raw crab from independent catchers, and they both withheld income tax for their employees and were subject to local property taxes on their shore facilities. Hence we are unable to conclude that the appellees' factory ships could be included in the general clause of "other floating cold storages."

8. At oral argument appellant's counsel conceded that removal of the vessels for periodic repairs and maintenance should not destroy the continuity of the period during which the vessels are deemed to be at fixed locations for one calendar year, there apparently not being any other way in which the vessels could be prevented from deteriorating. We have no reason to disagree with this practical construction of the statute.

9. The refund issue was not raised at trial in the Pan Alaska case, hence we limit our consideration of this issue on appeal to the appellee Wakefield.

urges that refunds are conditioned upon payment under protest according to AS 43.15.010; and that the trial judge incorrectly applied AS 09.10.050 (the six-year statute of limitations for actions to recover personal property) rather than AS 09.10.070 (the two-year statute of limitations for liabilities created by statute).

We cannot agree that the taxpayer is limited to recovery according to the statutory provision, AS 43.15.010. The common law has long recognized a cause of action in assumpsit to recover overpayments of taxes.[10] Because the statutory remedies do not explicitly supercede the common-law remedies, we conclude that they are intended as a supplement, and that the earlier remedy in assumpsit is still available. Hence the claim for a refund was timely under the six-year statute of limitations applicable to recovery of personal property.

The appellant further urges, however, that even if we recognize an assumpsit action for refund, the appellee must fail for not having satisfied the common-law requirement of a formal protest at the time of payment.

At common law a formal protest at the time of payment was required in order to demonstrate that the payment had been made involuntarily or under duress. But to continue to require a formal protest where involuntariness and duress are evidenced by other factors would amount to little more than the perpetuation of a dysfunctional legal nicety. Rather, courts have generally broadened their criteria of voluntariness by looking beyond the formal requisites of a protest and determining more appropriately whether duress may be implied from the circumstances surrounding the payment.[11] Under the old rule duress did not exist unless a loss of life, limb, or liberty were threatened. Now courts may find duress from a payment made to prevent potentially great loss of property or the imposition of substantial penalties.

This latitudinous approach to the common-law action for refund embraces a number of enlightened policies which we endorse. It encourages immediate payment of taxes, minimizes disruption of the tax collection machinery, minimizes apprehension and jeopardy for the taxpayer at the time of payment, and facilitates peaceful, relatively uncomplicated settlement of disputes through court actions for refunds.

One such relaxation of the common-law rule which we specifically endorse is the "business compulsion" standard of duress which was applied by the trial judge in this case. The taxpayer need not be threatened with imminent incarceration or other disastrous consequences before he may claim duress by business compulsion. The standard is satisfied if, under the circumstances, a reasonably prudent businessman would find it necessary to pay taxes in order to preserve or protect his property.[12]

In this case we note several compulsive factors influencing the decision of the appellee to pay the tax. AS 43.75.050 permits the collection of a penalty of 5% of the amount due for each thirty-day period or fraction thereof during which the failure to pay the taxes continues. This penalty is limited only by a maximum penalty of 25% in the aggregate. If the disregard of the regulation is determined to be "intentional" a penalty of 50% of the tax deficiency may be collected. The same

---

10. Stone v. White, 301 U.S. 532, 534–535, 57 S.Ct. 851, 81 L.Ed. 1265 (1937); Erskine v. Van Ardsdale, 82 U.S. (15 Wall.) 75, 77, 21 L.Ed. 63 (1872); Philadelphia v. Diehl, 72 U.S. (5 Wall.) 720, 731–732, 18 L.Ed. 614 (1867); 51 Am. Jur.Taxation § 1183 (1944).

1. E. g., United States v. Halton Tractor Co., 258 F.2d 612, 616 (9 Cir. 1958);

Thompson v. Deal, 67 App.D.C. 327, 92 F.2d 478, 484 (1937); Duke v. Force, 120 Wash. 599, 208 P. 67, 74 (1922). See generally Annot., 80 A.L.R.2d 1040 (1961); Annot., 75 A.L.R. 658 (1931).

12. Crow v. City of Corpus Christi, 146 Tex. 558, 209 S.W.2d 922, 924 (1948).

statute also permits the collection of interest on the taxes not paid. One need not incur the risk of such penalties, while the validity of the tax is being ascertained judicially, in order to qualify as a taxpayer under duress. National Biscuit Co. v. State, 134 Tex. 293, 135 S.W.2d 687 (1940).

AS 43.10.030 permits the property of the taxpayer to be distrained if he fails to pay the taxes. While there is a notice provision and a ten-day waiting period required by AS 43.20.270, there is no necessity for prior court adjudication.

AS 43.75.060 makes the license a condition precedent to fishing, and AS 43.75.090(b) makes failure to obtain a license a misdemeanor, which in this case may be punishable by a fine of $1,000, imprisonment for one year, or both. AS 43.75.050(f). Finally, AS 43.75.090(a) subjects the taxpayer to a lien on his property for failure to pay the tax, interest and deficiency assessments.

We hold that under the circumstances the potential liabilities and penalties are sufficient to fulfill the common law duress requirements according to the test of business compulsion.

The judgments of the superior court are affirmed.

Affirmed.

RABINOWITZ, Justice (dissenting in part, concurring in part).

I find I am unable to agree with the majority's construction of the statutes establishing the tax rate applicable to commercial crab fisheries for the tax period subsequent to 1955. In my opinion the commercial crab processing operations of appellees were taxable at the rate of four percent of the value of the crab meat processed during the tax period in question.[1] Consideration of the historical development of this statute, together with an analysis of the text, leads me to conclude that in regard to subsections (1) and (2) as AS 43.75.060 the legislature intended to distinguish between floating and shore based commercial crab fishing operations.

The critical problem raised in this appeal is whether floating crab processing ships fall within the class "Freezer ships and other floating cold storages" drawn by AS 43.75.060(2). The record adequately supports the trial court's finding that "freezer ship" is, and was at the time of enactment, a term which had acquired a "peculiar and appropriate meaning" within the fishing industry. However, "other floating cold storages" was not shown at trial to have any such peculiar meaning in the industry. Thus in the context of this litigation, this term, and its applicability to appellees' commercial crab fishing operations, required judicial construction. The basic rules of statutory construction are found in AS 01.10.040 where it is provided that common words are to be interpreted according to common usage and usual rules of grammar, and in AS 01.10.020 which mandates that all rules of construction are subordinate to the primary objective of effectuating legislative intent.[2] Also of significance is the rule of statutory construction this court recently employed in Laborers and Hod Carriers Union, Local No. 341 v. Groothius, Opinion No. 773, 494 P.2d 808 (Alaska, 1972). There we said:

> Although there may be a presumption that an amendment is intended to change legal rights rather than to interpret the preexisting law, the fact of amendment itself does not indicate whether the change is one of substance or form. Since the amendment was enacted during the controversy which arose as to the interpretation of the original act, it is just as logical to regard the amendment as a

---

1. In this regard I am of the further view that the first letter of notice to Pan Alaska from an official of the Department of Revenue, imposing the lower rate of one percent, was sufficient to constitute an administrative ruling which could not be changed retroactively or applied inconsistently.

2. Sherman v. Holiday Constr. Co., 435 P.2d 16 (Alaska 1967); Gordon v. Burgess Constr. Co., 425 P.2d 602 (Alaska 1967).

legislative clarification of the original language and not as a substantial change. (footnotes omitted)

With these rules of construction in mind, reference to the historical development of the legislation in question is appropriate. In 1949 the territorial legislature provided for license taxes on salmon, crab, and clam canneries. This 1949 act provided, in relevant part, for a license tax for "crab canneries, both shore based and floating. . . ."[3] The 1949 territorial legislature also enacted the first statute licensing and taxing other fish processors.[4] In this latter legislation, which was the predecessor of the present AS 43.75.060, the taxed class was defined as "Cold storage and other fish processors." The wording of the statute suggests that "cold storages" were engaged in what could be termed processing. This is further borne out by the provision for calculating the tax applicable to cold storages which was geared to the amount of fishing resource bought or otherwise obtained for processing through "freezing, salting, or other method."[5]

In 1951, "Freezer ships and other floating cold storages" were first singled out for a higher tax.[6] Subsection (a) of Section 1, Chapter 116 [1951] SLA referred to "Shore based cold storages and all other fish processors, except salmon canneries, herring processing plants, crab canneries and clam canneries." The 1 percent tax for such businesses was to be levied on the basis of "fishing resource[s] bought or otherwise obtained for processing through freezing, salting or other method." Sub-

section (b) of Section 1, Chapter 116 [1951] SLA provided for a tax equal to 4 percent on "Freezer ships and other floating cold storages" and was based on "fishing resource[s] bought or otherwise obtained for processing through freezing." Thus the 1951 act seems to have created an artificial distinction between floating freezers and whatever other fishing processing might happen to occur afloat. Such a distinction would be understandable and reasonable only if no other processes then took place afloat and none were envisioned.

In 1955 the legislature further amended the statute in question by eliminating this apparent distinction between floating freezers and other floating cold storages, or floating processors. This was accomplished by the legislature's providing that the 4 percent tax was applicable to "Freezer ships and other floating cold storages" based on the value of the "fishing resource bought or otherwise obtained for processing through freezing, salting or other method, or the taking of crab for export without such processing."[7]

In my view the legislative intent here was to further broaden that class encompassed by "freezer ships and other cold storages" to include all processing taking place afloat, whether or not then a common practice or one the legislature specifically foresaw. Once the language of what is now AS 43.75.060(1), pertaining to shore based cold storages and all other fish processors engaged in freezing, salting, or other methods of fish processing, was repeated in the 1955 amendment, the only way to avoid over-

3. Ch. 82, § 1, [1949] SLA, now codified as AS 43.75.010. This section provided as to crab canneries, both shore based and floating, the following:

An annual license tax equal to two percent of the value of the raw crabs. The raw crab value for the purpose of this license shall be the actual price paid for the same either by cash or its equivalent according to the provisions above set forth for herring processing plants.

Under the subsection relating to herring processing plants, the statutorily fixed criteria for determination of value of the raw material was made applicable to

herring caught in company owner or subsidized boats operated by employees of the processor or under lease or other agreement.

4. Ch. 97 [1949] SLA.

5. Note ch. 97 [1949] SLA did not then distinguish complete processing from incomplete. It should also be noted that this act explicitly recognized and treated alike resources obtained from company owned boats and from independent ones.

6. Ch. 116 [1951] SLA.

7. Ch. 102, § 1(b), [1955] SLA.

lap between AS 43.75.060(1) and AS 43.-75.060(2), relating to freezer ships and other floating cold storages engaged in freezing, salting, or other methods of fish processing, and to give effect to each section would be to make the dividing line between the two classes whether the fish processing facilities were afloat or ashore.

In 1966 during the controversy which arose as to the interpretation of AS 43.75.-060(1) and (2), the legislature amended AS 43.75.060 by providing that

'shore-based cold storages and other fish processors' mean those cold storages and processing plants which are permanently attached to the land or have remained in the same location for a period of not less than one calendar year.[8]

The 1966 amendment further provided that cold storages and fish processing plants which are not shore based under the above definition are floating cold storages under AS 43.75.060(2).

Thus it seems to me that the 1955 amendment, as further clarified by the 1966 amendment, broadened the scope of the class "Freezer ships and other floating cold storages" to include within its ambit the processing operations conducted aboard appellees' vessels.[9] Once the processing distinction between AS 43.75.060(1) and AS 43.75.060(2) was eliminated by the 1955 amendment, any attempt to maintain a distinction on processing lines becomes manifestly unmanageable and in conflict with the legislature's intent. Since the tax period in question did not begin until well after the 1955 amendment, the appellee crab processors should have been taxed in accord with the legislative intent that had by that time been demonstrated to classify fish processors on location criteria.

I am in agreement with the majority's disposition of the declaratory judgment and procedural tax issues which were presented in this appeal.

8. Ch. 88, § 1, [1966] SLA.

9. *See* Laborers and Hod Carriers v. Groothius, Opinion No. 773, 494 P.2d 808 (Alaska, 1972).