**PRINCIPAL MUTUAL LIFE INSURANCE COMPANY, Appellant, Cross–Appellee,**

v.

**STATE of Alaska, DIVISION OF INSURANCE, DEPARTMENT OF COMMERCE AND ECONOMIC DEVELOPMENT, Appellee, Cross–Appellant.**

**Nos. S–2517, S–2518.**

Supreme Court of Alaska.

Sept. 29, 1989.

---

**10.** The City's attorney furnished the trial court with documentation one week after the award of attorney fees was made.

Susan R. Pollard, William B. Rozell, Faulkner, Banfield, Doogan, & Holmes, Juneau, for appellant, cross-appellee.

Jeffrey W. Bush, Asst. Atty. Gen., Grace Berg Schaible, Atty. Gen., Juneau, for appellee, cross-appellant.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

In 1957, the Alaska legislature amended its tax on insurance premiums to impose a tax rate on insurers based outside of Alaska (hereinafter "foreign insurers") double that imposed on Alaska-based insurers (hereinafter "domestic[1] insurers").[2] Alaska's differential premium tax remained in effect from 1957 until its repeal in 1986. This repealed tax was codified in Alaska Statute 21.09.210(b):

> Each insurer ... shall pay a tax on the total direct premium income ... for the insurance of property or risks resident or located in the state [subject to enumerated exceptions and deductions].... The tax ... is computed at the rate of
>
> (1) for domestic companies, 1½ per cent;
>
> (2) for hospital and medical service corporations, 6 per cent of their gross premiums less claims paid;
>
> (3) for companies other than domestic and hospital and medical service corporations, 3 per cent.[3]

On October 23, 1981,[4] 11 foreign insurance companies, but not appellant, filed suit challenging the constitutionality of Alaska's differential premium tax. *John Hancock et al. v. State*, No. 1JU–81–1699 Civ. (Alaska Super., 1st Dist., Juneau, Oct. 23, 1981). Five more foreign insurance companies were added as plaintiffs in 1982. Similar suits were brought in other states, and on March 26, 1985, the United States Supreme Court decided the case of *Metropolitan Life Insurance Co. v. Ward*, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) (*Ward*), which involved a challenge to Alabama's differential premium tax law.

The Alaska legislature amended AS 21.-09.210(b) during the next full legislative session to equalize the tax rate applicable to foreign and domestic insurers at 2.7 percent, retroactive to January 1, 1986 (i.e., for taxes due April 1, 1987). Ch. 118, § 1, SLA 1986. On July 21, 1986, 14 more foreign insurance companies were added as plaintiffs in the *John Hancock* suit. Other cases were also filed concerning the constitutionality of AS 21.09.210(b), including a 1986 suit by two foreign insurance companies. *Northern Life Insurance Co. v. State*, 1JU–86–786 Civ. Settlement was reached with all 32 companies, and the

---

1. A "domestic" insurer is defined as one formed under the laws of the state of Alaska. AS 21.90.-070(a).

2. Ch. 173, § 9, SLA 1957, *codified as* § 42–1–14 ACLA (Supp.1958). Until 1957, the premium tax rates on foreign and domestic insurers were the same. Ch. 22, § 17, SLA 1937, *codified as* § 42–1–14 ACLA (1949) (2 percent); ch. 185, § 1, SLA 1957) (3 percent). There is no substantive legislative history on the differential tax provision, which was a floor amendment requested by Mr. K. Johnson and adopted by unanimous consent. 1957 House Journal 565.

The insurance law was extensively revised in 1966. Ch. 120, § 1, SLA 1966.

3. Unless otherwise noted, all references to AS 21.09.210(b) refer to the statute prior to its 1986 amending.

4. This suit was filed almost exactly five months after the Supreme Court's decision in *Western & Southern Life Ins. Co. v. State Board of Equalization*, 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514, 530 (1981), discussed *infra*.

*John Hancock* and *Northern Life* cases were dismissed in November 1986.[5]

On November 14, 1986, Principal Mutual Life Insurance Company ("Principal"), an Iowa corporation licensed by the Division of Insurance to do business in Alaska, filed with the Division a request for a refund of taxes paid under AS 21.09.210 in 1983, 1984, and 1985. The Division denied Principal's refund request. Principal requested a hearing before the Division on the denial, as authorized by AS 21.06.180. The Division, through the Department of Law, denied Principal's request. On February 27, 1987, Principal added a claim for a refund of premium taxes paid in the taxable years ending 1980, 1981, and 1982. The Division denied this refund request as well. Principal requests a total refund of $95,606 for taxes it alleged were overpaid for the tax years 1980–1985.[6]

Principal appealed the Division's refund denial to the superior court, which agreed with Principal that AS 21.09.210(b)(3) was unconstitutional. Citing *Ward*, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751, and *Metropolitan Life Insurance Co. v. Commissioner of Department of Insurance*, 373 N.W.2d 399 (N.D.1985), the superior court concluded that AS 21.09.210(b)(3) violated the equal protection provisions of both the Alaska and the federal constitutions. The superior court refused, however, to grant Principal any refund. The court found the analysis of *Commercial Fisheries Entry Commission v. Byayuk*, 684 P.2d 114 (Alaska 1984), controlling on

the question of whether Principal was entitled to retrospective relief.

The state has appealed the superior court's finding that AS 21.09.210 is unconstitutional. Principal has appealed the court's denial of any refund.

**A.** *AS 21.09.210(b) IS UNCONSTITUTIONAL UNDER THE EQUAL PROTECTION PROVISIONS OF THE FEDERAL AND ALASKA CONSTITUTIONS.*

■ We conclude that former AS 21.09.-210(b) [7] violates the equal protection clauses of both the Alaska and the federal constitutions. Principal's main argument, which we find persuasive, is that AS 21.09.-210(b) is unconstitutional because it imposes a higher tax on foreign insurance companies than on domestic insurance companies, a discrimination which lacks any legitimate state purpose.

■ Under federal equal protection analysis, the "imposition of more onerous taxes or other burdens on foreign corporations than those imposed on domestic corporations [is forbidden] unless the discrimination between foreign and domestic corporations bears a rational relation to a legitimate state purpose." *Western & Southern Life Insurance Co. v. State Board of Equalization*, 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514, 530 (1981) (*Western & Southern*). What level of scrutiny such discrimination is subject to under Alaska equal protection analysis has not been decided by this court.[8] In any

---

**5.** Although the state has refused to disclose the monetary figures involved in the settlement, the state has revealed that the settlement involves future tax credits to the companies.

**6.** Principal alleges that this sum is the difference between the 3 percent tax paid under AS 21.09.210(b)(3), and the 2 percent tax that would have been paid had AS 21.09.210(b)(3) not been in effect. Principal would have paid 2 percent (Iowa's premium tax rate) rather than 1½ percent because of Alaska's retaliatory tax, AS 21.09.270(a). Under this statute, if the home state of a foreign insurer imposes a higher premium tax on insurers doing business in the home state than Alaska imposes on its domestic insurers, then Alaska imposes the foreign state's higher premium tax rate on the foreign insurer's business in Alaska. Principal has not challenged Alaska's retaliatory tax as part of this litigation. California's retaliatory tax survived a constitutional challenge in *Western & Southern*, note 4 *supra,* and discussed *infra.*

**7.** As discussed above, the superior court actually declared subsection (b)(3) unconstitutional. The statute is unconstitutional because subsections (b)(1) and (b)(3) provide different tax rates for foreign and domestic companies. Subsection (b)(2) is not unconstitutional provided that it is interpreted to include domestic, as well as foreign, hospital and medical service companies. We believe that this interpretation comports with the rules of statutory construction.

**8.** The state's reliance on *Williams v. Zobel*, 619 P.2d 422, 427 (Alaska 1980), for its assertion

case, the minimum level of equal protection scrutiny in Alaska, also denominated a rational basis test, is more demanding than the federal rational basis test mandated by *Western & Southern.*[9]

In *Ward,* the Supreme Court considered Alabama's differential premium tax statute, Ala.Code § 27-4-4 & -5 (1975). 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751. The Court held that the two purposes of the statute advanced by the state, promoting the formation of new domestic insurance companies in Alabama and encouraging capital investment by insurance companies in Alabama, were not legitimate state purposes, but rather were "purely and completely discriminatory, designed only to favor domestic industry...." 470 U.S. at 878, 105 S.Ct. at 1681, 84 L.Ed.2d at 759.

The state denies that AS 21.09.210(b) reflects any intent "to penalize foreign, or reward domestic, insurers", and advances three state purposes it believes are legitimate:

1) The tax differential enables domestic insurers, burdened by Alaska's higher costs of doing business, to maintain competitive equality with foreign insurers.

2) The tax differential ensures a more stable insurance market in Alaska because domestic insurers cannot leave the state if they perceive the risks to be too high.

3) The tax differential increases the availability of insurance in Alaska because domestic insurers are more familiar with the state and will write coverage for risks which foreign companies will not insure.

We are not persuaded by the state's arguments. Even if we accept the legitimacy of these purposes,[10] there is no evidence whatsoever in the record to support the state's contention that they are advanced by the differential tax rates imposed by AS 21.09.-210.[11]

The state's first argument fails to persuade us because the state has not presented any evidence supporting its claim that domestic insurers have a higher cost of doing business in Alaska than do foreign insurers. Moreover, even if such evidence were presented or judicially noticed, it is doubtful that any difference is simply the result of the insurer's decision to locate its home office in Alaska. It is reasonable to assume that foreign and domestic insurers operating in Alaska pay their Alaska agents and claims adjusters roughly equivalent salaries and commissions, and that their Alaska policyholders make equivalent numbers of claims. (Payment of claims is the largest cost of doing business.) The state has introduced no evidence indicating that foreign and domestic insurers insure different Alaska risk pools.

that Alaska's standard of review is also the rational basis test is inaccurate. In *Williams,* we stated that "[f]reedom from disparate taxation is not a *federally* protected fundamental right...." *Id.* at 427 (emphasis added). We did not explicitly state in *Williams* what standard of review was used in our state equal protection analysis. *See id.* at 427–29. *Williams* is also inapposite because it involved discrimination in tax rates between two classes of Alaska residents, not between Alaska and non-Alaska residents. The only other case involving differential tax rates and discussing Alaska equal protection analysis is also inapposite. *Sisters of Providence in Washington, Inc. v. Municipality of Anchorage,* 672 P.2d 446, 448 n. 1 (Alaska 1983) (holding that different tax for owned and leased equipment is "rational and bears a fair and substantial relation" to the statute's goal).

**9.** *Isakson v. Rickey,* 550 P.2d 359, 362 (Alaska 1976), *superseded on other grounds, Commercial Fisheries Entry Com'n v. Apokedak,* 606 P.2d

1255, 1261 (Alaska 1980) (Alaska will apply more flexible and more demanding standards where equal protection scrutiny is appropriate); *Alaska Pacific Assurance Co. v. Brown,* 687 P.2d 264, 269–70 (Alaska 1984) (under minimum level of constitutional review, there must be a substantial relationship between legitimate legislative goals and the ends chosen to achieve those goals).

**10.** Making insurance coverage available to Alaska residents is a legitimate state purpose. *See Penn Mutual Life Insurance Co. v. Department of Licensing and Registration,* 162 Mich.App. 123, 412 N.W.2d 668, 672 (1987).

**11.** In comparison, the state in *Ward* submitted economic studies "document[ing] differences between the two classes of insurers that are directly relevant to the well-being of Alabama's citizens." 470 U.S. at 887, 105 S.Ct. at 1686, 84 L.Ed.2d at 765 (O'Connor, J., dissenting).

The only substantial business expense that may be significantly higher in Alaska than in Des Moines, Iowa, where Principal's home office is located, is administrative costs ("paperwork").[12] This argument becomes much less persuasive when we substitute Hartford-based Aetna or New York-based Metropolitan Life for Principal. However, there is nothing preventing an Alaska insurer from contracting out the bulk of its paperwork to a non-Alaska company or setting up an administrative center in a less expensive state.

Contrary to the state's second argument, there is no reason why domestic insurers cannot leave the state if they find the risks to be too high; Alaska-organized insurers are free to obtain licenses to do business in other states, just as foreign insurers are free to seek licenses to do business in Alaska.

Third, merely because an insurer is organized in Alaska does not necessarily mean that it is more familiar with the state than are foreign insurers (who may have operated in the state for much longer periods of time).[13] Even if we assume that domestic insurers are more familiar with Alaska's insurance environment than are foreign insurers, it does not logically follow that domestic insurers will write coverage for risks that foreign companies will not insure. Indeed, a domestic insurer's alleged greater familiarity with the state may cause it to avoid underwriting Alaska risks that foreign underwriters do underwrite. Nothing in Alaska's insurance laws compels domestic insurers to underwrite risks that foreign insurers are not required to underwrite.

The Michigan Court of Appeals reached the same conclusion in finding Michigan's differential tax statute unconstitutional:

> We hold that, unlike in *Ward*, the purpose advanced by the state is legitimate (i.e., making insurance coverages available to residents), but the means chosen are not rationally related to promoting that purpose. The classification scheme is based on residency. Although it is not required that close distinctions be drawn in making classifications, the foreign/domestic classification scheme made here affords no opportunity for a foreign insurer to share in the tax preference given to domestic insurers if it desires to offer insurance in the areas of greatest public need despite the lower profit potential. The classification scheme also permits a domestic insurer to obtain a tax preference over foreign insurers even if the line of insurance offered is in a more lucrative market. Thus the classification is both under and over inclusive and not rationally related to promoting insurers to offer insurance in the high loss ratio areas such as medical malpractice, farm owners multiple peril, liquor liability, municipal liability, and product liability.

*Penn Mutual Life Insurance Co. v. Department of Licensing & Registration*, 412 N.W.2d 668, 672–73 (Mich.App.1987). *See also Met. Life v. Com'r.*, 373 N.W.2d at 406–08 (holding North Dakota's premium tax, applicable only to foreign insurers, unconstitutional).

The state's reliance on *Western & Southern*, in which the Supreme Court of the United States upheld the constitutionality of California's retaliatory tax[14] on commerce clause and equal protection grounds, is misplaced. A retaliatory tax does not violate the federal equal protection clause, the Court held, because it is rationally designed to "deter[ ] other states from enacting discriminatory or excessive taxes", thereby promoting the domestic insurance industry by lowering barriers to interstate business. 451 U.S. at 668–74, 101 S.Ct. at 2083–86, 68 L.Ed.2d at 531–35. Alaska's differential premium tax, on the other

---

**12.** This argument assumes that labor is the largest component of administrative costs and that Alaska's cost of labor is higher than Des Moines'.

**13.** Alaska Statute 21.09.210(c) exempts a domestic (but not a foreign) insurer from payment of the premium tax for five years from the date of its organization.

**14.** Alaska's retaliatory tax is discussed *supra* in note 6.

hand, does not encourage other states to lower the rate premiums they impose on Alaska insurers. For no matter how low the rate imposed by the foreign insurer's home state, AS 21.09.210 requires a foreign insurer to pay twice the premium rate paid by Alaska insurers. Unlike a retaliatory tax, AS 21.09.210 does not provide for the reduction of taxes on foreign business upon the reduction by their states of taxes imposed on Alaska businesses. *Compare,* AS 21.09.270, discussed *supra* in note 6.

We therefore conclude that AS 21.09.-210(b) is unconstitutional under the equal protection clauses of both the Federal and Alaska Constitutions.[15]

### B. *DOES PRINCIPAL HAVE A RIGHT TO A REFUND OF TAXES PAID UNDER AS 21.09.210(b)?*

Alaska Statute 43.15.010 governs whether a party may obtain a refund of taxes paid to the state.[16] This statute allows for the recovery of both inadvertent overpayments, and taxes paid under protest:

(a) The Department of Administration shall, with the approval of the attorney general and the Department of Revenue, refund to a taxpayer the amount of a tax

paid to the Department of Revenue under protest and deposited in the treasury if (1) the taxpayer recovers judgment against the Department of Revenue for the return of the tax, or (2) in the absence of a judgment, it is obvious to the Department of Revenue that the taxpayer would obtain judgment if legal proceedings were prosecuted by the taxpayer.

(b) The Department of Administration shall refund the amount of an overpayment to a taxpayer if the Department of Revenue, on audit of the account in question, determines that a remittance by the taxpayer exceeds the amount due.

Principal argues that it "is [e]ntitled to a [r]efund of [e]xcess [t]axes [p]aid ..." under AS 21.09.210(b) for the 1980–1985 tax years. These taxes were not paid under protest.

Alaska Statute 43.15.010 [17] has been interpreted in a manner that would preclude relief to Principal (1) because Principal did not pay the premium taxes under protest, as required by subsection (a), and, (2) because implicit in subsection (b) is the concept that the tax imposed was valid, and that the taxpayer, by the terms of the tax statute at the time of payment, erroneously

**15.** Since AS 21.09.210(b) fails the federal rational basis test, *a fortiori,* it does not satisfy Alaska's more demanding equal protection analysis.

**16.** Because AS 43.15.010 provides a remedy for those who seek refunds, we reject the view of both parties that *Commercial Fisheries Entry Commission v. Byayuk,* 684 P.2d 114 (Alaska 1984), is relevant for purposes of determining whether Principal is entitled to a refund in this case.

**17.** In *Pacific American Fisheries, Inc. v. Mullaney,* 13 Alaska 729, 734, 105 F.Supp. 907, 909 (D.Alaska 1952) a District Court for the Territory of Alaska denied a claim for a refund of an unconstitutionally collected nonresident fishing license fee under § 48–7–1, ACLA, which was recodified as AS 43.15.010. Ch. 16, § 1, SLA 1962. There Judge Folta wrote in part:

At common law, a taxpayer had an action in the nature of assumpsit whenever taxes were paid under duress and coercion, *and* they were wrongfully assessed. Section 48–7–1(a) [amended and recodified as AS 43.15.010(a)] provides for a refund of taxes paid under protest. At common law, no such refund could be secured on the basis of a mere pro-

test. Section 48–7–1(b) [amended and recodified as AS 43.15.010(b)] provides for return of overpayments, and does not even require a protest, let alone duress. At common law, no recovery was allowed in this situation either. Therefore, it would appear that two new means of recovery have been created, and, since the common law action, requiring protest, wrongful assessment and duress, is not mentioned, it is apparent that the statutory forms are in addition to the one already in existence. It would seem that the statutes were intended to liberalize recoveries by creating rights where formerly none existed. The statutes may well be exclusive as to the situations covered by them, but, since they do not cover the duress situation, an action based on duress will still lie.

Even though an action will still lie outside the statutes, its requisites are not fulfilled by the allegations in the third count. Payment under protest, duress and an invalid assessment are not alleged. Since it is insufficient on these grounds, it is unnecessary to determine whether or not plaintiff is the real party in interest as to that part of the claim which was deducted from the fishermen's wages. (Emphasis in original.)

remitted too much. We hold that Principal will be entitled to a refund only under subsection (a), and only if it is determined that the state waived the protest requirement in Principal's case.

Examination of the record shows the following in regard to the history of this litigation.

On November 14, 1986, Jed Fisk, Assistant Director of Principal's corporate tax division wrote to the Director of the Division of Insurance. This letter reads in part:

*A review of your state's administrative provisions fails to provide guidance on a prescribed format for filing claims for refunds of premium taxes.* The format of the enclosed Claims for Refunds [for tax years 1983, 1984, and 1985 in the amount of $62,739] provides the necessary information to determine the amount and propriety of the Claim. We hereby request that you indicate on the enclosed page if the format is NOT acceptable or will NOT constitute a valid Claim for Refund. (Emphasis furnished.)

On November 25, 1986, the Director of the Division of Insurance sent to Jed Fisk Order No. 86–19 which reads as follows:

We have reviewed your claim for a premium tax refund for the calendar years of 1983, 1984, and 1985. These premium taxes were properly paid under the provisions of Alaska Insurance Laws (AS 21). Therefore your claim is denied.

Subsequent to the receipt of Order No. 86–19, Principal wrote the Director of Insurance demanding "a hearing pursuant to AS 21.06.180 of the Alaska Insurance Code regarding our request for a refund of premium taxes paid for the years ending December 31, 1983, December 31, 1984, and December 31, 1985." The state responded to Principal's request in the following manner:

... Please be advised that you may consider Order No. 86–19, dated November 25, 1986, as a final order for appeal purposes. Because the issues in this case appear to be purely of a legal nature, there would be little purpose in holding any hearing. A similar approach has been taken in other cases challenging Alaska's premium tax laws as they existed prior to 1986.

. . . .

There is a long line of case law holding that when a court declares a tax or license fee invalid, that ruling is given prospective effect only, in order to avoid imposing undue administrative or financial burdens on the public and the taxpayers. (Citations omitted.)

. . . .

A few cases, however, have recognized an exception to the general rule of no retroactive relief. In these cases, the rule has been that the court will utilize its equitable powers to give its ruling a limited retroactive effect, only as to the parties in the litigation, and only back to the time that suit was brought. *Rio Algom Corp. v. San Juan County*, 681 P.2d 184, 196 (Utah 1984). *Since your company paid the premium taxes without any formal refund requests until November 1986, we would contend it has no legitimate claim for any refund.*[18] (Emphasis furnished.)

Given the record in this appeal we have concluded that the most appropriate disposition of the refund issue is to remand the matter to the superior court in order to permit the court to conduct such further proceedings as it deems necessary to resolve the following issues:

---

**18.** Subsequent to the state's response the parties stipulated that

[T]his extension of time will provide adequate time for Principal Mutual to file a claim for refund with the Division of Insurance for premiums taxes for additional years and for the Division to act on that refund claim.

Thereafter on February 27, 1987, Principal filed a refund claim in the amount of $37,862.00 for the 1980, 1981, and 1982 tax years. By order No. 87–19, dated March 6, 1987 the Division of Insurance advised Principal that:

We have reveiwed your claim for a premium tax refund for the calendar years 1980, 1981, and 1982. These premiums taxes were properly paid under the provisions of Alaska Insurance Laws (AS 21). Therefore, your claim is denied.

(1). Did the state waive the requirement of AS 43.15.010(a) that Principal protest the payments of premium taxes at the times payments were made for the tax years 1980, 1981, 1982, 1983, 1984, and 1985? (2). In the event it is held that the state waived the requirement of payments of the taxes under protest, and that Principal is entitled to a judgment for a refund of the questioned taxes, then the applicable limitations period governing Principal's claims for refunds should be determined.[19]

Concerning the question of whether the state waived the provision of AS 43.15.010(a) which requires that taxes must be paid under protest in order to obtain a refund, we consider it appropriate to make the following observations.

The general rule at common law is that if an illegal tax is voluntarily paid by the taxpayer without compulsion it cannot be recovered back in an action at law.[20] There is case authority holding that the protest by itself, renders the payment involuntary.[21] Accordingly, there is also authority which holds that taxes voluntarily paid cannot be recovered where there was no protest made at the time of payment.[22]

Some jurisdictions have by statute provided for the recovery of illegal taxes in actions at law where payment of the taxes was made under protest.[23] The Alaska legislature has provided for such a remedy by enacting AS 43.15.010(a). It is clear that AS 43.15.010(a) is a valid enactment in derogation of the common law rule regarding voluntary payment of taxes. The purpose of AS 43.15.010(a) is to "liberalize recoveries by creating rights where formerly none existed." *Pacific Am. Fisheries, Inc. v. Mullaney*, 13 Alaska 729, 734, 105 F.Supp. 907, 909 (D.Alaska 1952), and to provide an expeditious method by which state government can obtain necessary revenues. The protest requirement called for by AS 43.15.010(a) serves several purposes. It serves as proof that the payment of the tax in question was involuntarily made and it provides notice to the taxing authority that the tax is claimed to be illegal as well as the basis of the taxpayer's assertion.

■ One additional point remains to be made. In *State v. Wakefield Fisheries, Inc.*, 495 P.2d 166 (Alaska 1972), this court held:

> [T]he taxpayer is [not] limited to recovery of overpayments according to AS 43.15.010. The common law has long recognized a cause of action in assumpsit to recover overpayments of taxes. Because the statutory remedies do not explicitly supersede the common-law remedies, they are intended as a supplement, and the earlier remedy in assumpsit is still available.

Although we now question whether the common law remedy of a cause of action in assumpsit survived the enactment of AS 43.15.010, we take this occasion to overrule that portion of *Wakefield* which holds that there is no requirement that a taxpayer formally protest the payment of the tax at the time of payment in order to subsequently maintain a common law action in assumpsit for a tax refund. The burden of requiring a taxpayer to file a protest at the time of payment of the tax is at most minimal. On the otherhand the requirement of a protest serves the important function of providing state government with notice of the claimed tax illegality, the grounds advanced in support of the claimed illegality, and affords the state the opportunity to fashion budget appropriations, or

---

19. Although we do not decide the issue at this time it appears that AS 43.05.275 provides for a three-year limitations period for claims made under AS 43.15.010. Alaska Statute 43.05.275(a)(1) requires that a taxpayer file a refund claim "before the later of (A) three years from the time the return was filed; or (B) two years from the time the tax was paid."

20. *National State Bank of Boulder v. State*, 156 Colo. 34, 396 P.2d 948 (1964).

21. *Title Guarantee & Trust Co. v. City of New York*, 265 A.D. 304, 38 N.Y.S.2d 715 (1942), *affirmed* 290 N.Y. 910, 50 N.E.2d 301 (1943).

22. *Selectmen of Hull v. County Commissioners of Plymouth County*, 12 Mass.App.Ct. 900, 422 N.E.2d 787 (1981).

23. *Helmsley v. City of Detroit*, 320 F.2d 476 (6th Cir.1963); *North Pier Terminal Co. v. Tully*, 62 Ill.2d 540, 343 N.E.2d 507 (Ill.1976).

expenditures, taking into account the magnitude of the claimed tax illegality. We think these are significant considerations which warrant the retention of the requirement of a protest.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

COMPTON, J., dissents.

COMPTON, Justice, dissenting in part.

I disagree with the disposition of this case mandated in Section II of the opinion. The court concludes that "the most appropriate disposition of the refund issue is to remand the matter to the superior court to conduct such further proceedings as it deems necessary to resolve the following issues," issues which I observe are not raised in either the briefs or the arguments of the parties. In order to reach this result, the court interprets AS 43.15.010(a), a statute neither party cites, and then gratuitously overrules a portion of *State v. Wakefield Fisheries, Inc.*, 495 P.2d 166 (Alaska 1972), a case neither party cites.

To the court's credit, it does not attempt to justify the result under any particular judicial doctrine such as the "plain error doctrine," but that does not make the result any more palatable. In my view the manner in which the court proceeds in resolving this case is just as flawed as it was in *Clark v. Greater Anchorage, Inc.*, 780 P.2d 1031 (Alaska 1989) (Compton, Justice, dissenting). Surely it cannot be said that on this record "it appears an obvious mistake has been made which creates a high likelihood that injustice has resulted." *Clark*, dissent at 1039.